THALIA CHAMBERS vs. BUILDING INSPECTOR OF PEABODY &
others.[1]

No. 95-P-1522.

Essex. May 10, 1996. - July 22, 1996.

Present: SMITH, PORADA, & IRELAND, JJ.

*Zoning,* Special permit, Site plan approval. *Practice, Civil,* Standing. *Words,*
"Person aggrieved."

A city council improperly delegated to the community development depart-
ment authority to review and approve final plans for a project that
required the council's approval for a special permit, thus the community
development department was without authority to approve a final plan
that substantially changed the original plan: the building inspector
incorrectly issued building permits for construction that differed from
the original site plan. [765-767]
A plaintiff challenging the issuance of building permits following modifica-
tion of a site plan for abutting property was a person aggrieved with re-
spect to those proposed modifications that exceeded the scope of the
original site plan, to which the plaintiff had not objected. [768]
In the circumstances of an abutter's challenge to the issuance of building
permits for a project constructed pursuant to an invalid approval of a
modified site plan, the matter was remanded to the Superior Court for
further proceedings after the project's owner has the opportunity to ap-
ply for a special permit for the facility as actually constructed. [768-769]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment on August 9, 1993, and December 6, 1993, respectively.

The cases were consolidated for trial and heard by *Eliza-
beth B. Donovan,* J.

*Nicholas J. Decoulos* for the plaintiff.

*Molly Cochran* for Elder Living, Inc., & another.

*John A. Christopher,* Assistant City Solicitor, for Board of
Appeals of Peabody.

[1]The board of appeals of Peabody, Elder Living, Inc., and Sunrise at
Gardner Park Limited Partnership.

IRELAND, J. The plaintiff, whose property abuts the site of a recently constructed assisted living facility, appeals from a judgment of the Superior Court denying relief.

In separate zoning appeals filed in the Superior Court under § 17 of the Zoning Act, G. L. c. 40A, the plaintiff contended that the foundation and building permits for the facility were issued by the building inspector in violation of the city's zoning ordinance. The plaintiff argues that the two permits were not based upon the original site plan for the facility, which the city council had approved in July, 1990, when it issued a special permit for the project, but, rather, upon a revised site plan that was never submitted to the city council. Among other modifications to the original plan, the revised site plan increased the building's footprint by eleven percent and relocated the building's rear foundation walls closer to the plaintiff's property. According to the plaintiff, those modifications contravened the terms and conditions of the special permit and, hence, the ensuing foundation and building permits were issued in error. For their part, the defendants deny that the building permits were wrongly issued; they also contend that the plaintiff is not a "person aggrieved" within the meaning of G. L. c. 40A with standing to seek judicial review of her complaints about the project. We reverse the judgment and remand the matter to the Superior Court for further proceedings.

1. *Background.* In May, 1990, Elder Living, Inc. (Elder Living), applied to the city council (the city's permit granting authority) for a special permit to construct upon the locus an assisted living facility. As required by the zoning ordinance, Elder Living included with the application a site plan of the locus showing the proposed improvements. The special permit application and the accompanying site plan were approved by the city council, and a special permit was issued July 6, 1990. The plaintiff did not appeal from the grant of the special permit.

The special permit contains fifteen conditions, two of which (Condition 3 and Condition 5) are relevant:

> "3.    The proposed structure shall be limited to fifty-two (52) living units, and *there shall be no structural additions to said premises.*

> " . . .

"5.   The proposed building architecture shall be of a
      Victorian Mansion style as represented by the
      petitioner at the public hearing. *The Community
      Development Department shall review the final
      design and building plans which shall include
      exterior building materials and proposed landscap-
      ing. . . .*" (Emphasis supplied.)

As noted, the site plan approved by the city council in
1990 was revised in February, 1993, by enlarging by eleven
percent the proposed building's footprint. This resulted in
moving the building's rear foundation walls slightly closer to
both side lines of the locus (the structure as revised was,
however, still in compliance with the fifteen-foot sideyard
setback requirement of the zoning ordinance). In addition, air
conditioner cooling towers and trash dumpsters were added
(given precise locations) on the revised site plan. The design
of the parking lot was modified from the original site plan,
and its size was increased slightly in order to provide easier
turning radii for vehicles entering and exiting the locus. A
gazebo (which was never built) was added as well. The revised
plan also did not include a 38,537 square foot portion of the
plaintiff's lot that, on the original site plan, had been included
as part of the parcel assembled for the new facility. As a
result, the area of the locus on the revised site plan was a
little over two acres.

The city council never voted on the revised site plan.
Instead, purportedly acting pursuant to Condition 5 of the
special permit, *supra,* the revised site plan was reviewed and
approved by the city's development department. On March
31, 1993, Elder Living's successor applied to the building
inspector for a building permit for the facility. On April 2,
1993, the building inspector issued a "foundation only"
permit on the basis of the revised site plan. On July 16, 1993,
the building inspector issued a building permit, again based
on the revised site plan. In the meantime, the plaintiff, on
April 15, 1993, and again on August 12, 1993, requested the
building inspector pursuant to G. L. c. 40A, § 7, to enforce
the zoning ordinance as it relates to the issuance of both
permits. The requests were denied.[2] Thereafter, the plaintiff
appealed from the building inspector's actions to the board of

---

[2]In an April 20, 1993, letter to the plaintiff's counsel, the building inspec-
tor wrote that, while there were changes in the revised plan from the origi-

appeals, which also denied the requests for relief. The plaintiff then brought these actions under G. L. c. 40, § 17, seeking judicial review of the building inspector's actions in issuing both permits. The Superior Court consolidated the two appeals into one case.

2. *Issuance of permits.* Following a bench trial, a Superior Court judge ruled that the original site plan approved by the city council was a preliminary plan to which the city council contemplated certain changes would be made as the project progressed. The judge concluded that, in failing to appeal from the special permit grant in 1990, the plaintiff had waived her right to contest the city council's delegation of authority under Condition 5 of the special permit to the development department to review and approve final plans. Notwithstanding this ruling, the judge also observed that the city council had not exceeded its authority by approving preliminary plans and then delegating review and approval of final plans to the development department. Finally, the judge concluded that none of the modifications contained in the revised site plan (with the possible exception of the gazebo) contravened any of the conditions of the special permit. According to the judge, the changes "were clearly within the power delegated to the . . . [d]evelopment [d]epartment pursuant to Condition #5." Hence, the judge ruled that neither the foundation permit nor the building permit was issued in violation of the terms of the special permit or the provisions of the zoning ordinance. We disagree.

First, given the language employed in Condition 5, such as "Victorian Mansion style" architecture, "exterior building materials," and "proposed landscaping," we think the condition merely contemplates relatively minor details and changes to the original site plan, amounting to "final touches" in, for example, the building's exterior design, the type or style of siding, trim, roofing, and the finish landscape design. By the same token, we do not think Condition 5 allows the development department to approve substantial changes to the origi-

nal plan, the revised plan complied with the site plan requirements and dimensional (setback) requirements of the zoning ordinance, and it did "not violate any of the conditions placed on the special permit by the City Council." The letter also indicated that, under Condition 5 of the special permit, review of the final plan was delegated to the city's development department.

nal site plan. The significant increase in the building's size or
footprint and the change (however slight) in the building's
actual location upon the locus were changes of substance.
Condition 3 prohibiting "structural additions" adds further
weight to our conclusion that the delegation to the develop-
ment department was narrow and confined in scope. "Struc-
tural additions" obviously includes free-standing structures
such as the gazebo that are entirely separate from the main
building, as well as annexes or wings that are connected to
the building. In the context of the special permit and its at-
tached conditions, the phrase also includes any enlargements
to the building, such as an added story, or an increase in the
size of the footprint, as both would require structural
modification of the original plans.

Second, "a permit granting authority . . . *may not delegate
to another board,* or reserve to itself for future decision, the
determination of an issue of substance, i.e., one central to the
matter before the permit granting authority" (emphasis add-
ed). *Tebo* v. *Board of Appeals of Shrewsbury,* 22 Mass. App.
Ct. 618, 624 (1986), *S.C.,* 400 Mass. 464 (1987) (special
permit for gravel removal that postponed for future determi-
nation a satisfactory plan for dust control was invalid). See
also *Weld* v. *Board of Appeals of Gloucester,* 345 Mass. 376,
378-379 (1963). Compare *Kiss* v. *Board of Appeals of Long-
meadow,* 371 Mass. 147, 158-159 (1976) (where permit
granting authority issued special permit with condition that
location of building be approved by it *and* the planning board,
"[i]t might have been preferable if the board . . . [had not]
purport[ed] to give the planning board any power of approv-
al. . . . However, . . . the board has [not] delegated its power
. . . to pass on the matters"). Contrast *Ranney* v. *Board of
Appeals of Nantucket,* 11 Mass. App. Ct. 112, 118 (1981) (de-
cision on type and color of roof shingles referred to historic
districts commission was not impermissible delegation of mat-
ter of substance).

The size and location upon the locus of the proposed build-
ing was an issue of substance for both the city council, in its
decision whether to issue a discretionary special permit, and
for abutters, such as the plaintiff, who were required by law
to receive notice of the public hearing on the special permit
application. The location of the improvements on the site,
their mass, ground coverage, and distance from lot lines are

of particular and prime importance to neighboring property owners. (At its closest point, the structure depicted on the plot plan prepared for permitting purposes is approximately fifty-nine feet from the plaintiff's property and twenty feet from the property on the opposite side.) The zoning ordinance, at § 4.4.2(c), requires that a site plan submitted in conjunction with an application for a special permit depict the size and location of proposed structures. We think it reasonable to assume, therefore, that, when a board is asked to exercise its discretion to grant a special permit, the site plan submitted by the owner or developer should accurately reflect the proposed facility in this and other key regards.

The city council was also required under § 4.4.1(d)(3) of the zoning ordinance to assure that adequate provisions were made by the applicant concerning the "[p]ossible noise, glare, and odor effects" of the proposed project upon adjoining properties. Hence, the city council needed to be aware of such aspects of the project as the location of the air conditioner cooling towers, one of which has been located near the plaintiff's property, and which, according to her testimony, sounds "like an airplane ready to take off" and emits a continual "groaning sound."

We conclude, then, that, given the absence of approval by the city council of the revised site plan, the developer was confined to erecting a structure in substantial conformity with the original site plan. "[A] site plan ostensibly serves to provide detailed information to the granting authority on aspects of the proposed development." Bobrowski, Massachusetts Land Use and Planning Law § 9.7, at 363 (1993). See *Prudential Ins. Co. of America* v. *Board of Appeals of Westwood*, 23 Mass. App. Ct. 278, 281 n.6 (1986) (site plans disclose "the specifics of the project, including the proposed location of buildings, parking areas, and other installations on the land"). If a developer wishes to undertake significant modifications to a site plan, it is required to submit a revised site plan to the permit granting authority for consideration at another public hearing. The foundation and building permits in this case, incorporating as they did substantial changes to the facility from what the city council had first approved, were issued in derogation of the provisions of the zoning ordinance and the terms and conditions of the 1990 special permit.

3. *Standing.* The judge concluded in her memorandum of decision that the plaintiff was an aggrieved person whose alleged injury is different from the concerns of the community at large. See *Marashlian* v. *Zoning Board of Appeals of Newburyport*, 421 Mass. 719, 721 (1996); *Barvenik* v. *Aldermen of Newton*, 33 Mass. App. Ct. 129, 131 (1992). She further concluded, however, that the plaintiff had not suffered harm over and above that occasioned by the project as originally approved by the city council according to the first site plan. In other words, the modifications to the site plan of which the plaintiff complains, according to the judge, did not contribute to a net increase in the amount of harm to the plaintiff's property or legal interests. In effect, the judge required the plaintiff, in order to demonstrate that she was a "person aggrieved," to show harm greater than that occasioned by a use that had already been approved by the city council. This was inconsistent with the principle that the term " 'person aggrieved' should not be construed narrowly." *Marashlian* v. *Zoning Board of Appeals of Newburyport, supra* at 722. In the *Marashlian* case, the Supreme Judicial Court declined to adopt a rule that would require a plaintiff to show "a substantial likelihood of harm greater than that which would result from use of the property permissible as of right." *Id.* at 724. "Although the magnitude of the threat of harm to a potential plaintiff in relation to the threat of harm from a use permissible as of right is a factor that may be considered, it is not dispositive of the standing issue." *Ibid.* Under this formulation, the plaintiff should not have been required to show evidence of harm to her property or legal interests caused by the modifications to the site plan that exceeded the over-all harm stemming from the project as originally approved. Moreover, we believe that a building located closer than planned to the plaintiff's property line that is eleven percent larger than the one first proposed, plus a noisy air conditioner cooling tower located near the plaintiff's property, add up to evidence of aggrievement. The plaintiff had standing to pursue zoning relief.

4. *Remedy.* The facility was completed sometime in 1994. At the time of trial in late 1994, it housed some thirty-five elderly residents, many in their mid or late eighties. In asking for injunctive relief, the plaintiff apparently seeks either to have the facility shut down altogether and its residents moved

elsewhere or to have the offending conditions — including the eleven-percent increase in the building's footprint — corrected by whatever means necessary.

Such drastic solutions are not appropriate, at least at this time. Sunrise at Gardner Park Limited Partnership (the facility's present owner) must first be afforded a reasonable opportunity to apply to the city council for a new special permit for the facility in its presently constructed form. Compare *Building Inspector of Falmouth* v. *Haddad*, 369 Mass. 452, 459-461 (1976) (a structure erected without a required special permit should not be ordered removed until its owner has been give a reasonable opportunity to obtain any permit necessary to put all or part of the structure to a use permitted as of right or by special permit under the zoning by-law), and cases cited.

The judgment is reversed. The case is remanded to the Superior Court which shall retain jurisdiction and which shall issue such orders as it deems necessary to assure that the facility's owner proceeds without unreasonable delay in applying for another special permit.

*So ordered.*