NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1321                                          Appeals Court

ROGER AIELLO, trustee,[1] vs. PLANNING BOARD OF BRAINTREE &
others.[2]

No. 15-P-1321.

Suffolk.     October 20, 2016. - April 14, 2017.

Present: Meade, Milkey, & Kinder, JJ.

Practice, Civil, Zoning appeal, Standing. Zoning, Appeal,
    Person aggrieved, By-law.

Civil action commenced in the Land Court Department on
October 14, 2009.

The case was heard by Karyn F. Scheier, J.

Brian K. Bowen for the plaintiff.
Jason W. Morgan for McCourt Construction & another.
Carolyn M. Murray (Judy A. Levenson also present) for
planning board of Braintree.

MEADE, J. In this matter we examine the issue of standing

to appeal from a zoning decision in the context of an abutter's

appeal of decision of a local planning board (board) to allow

_____

[1] Of the Roger E. Aiello Revocable Trust.

[2] McCourt Construction and RMT Braintree, LLC.

modification of a 1994 special permit to remove conditions that benefited the residential abutter in terms of visual and auditory impacts. We conclude that it was error for the judge to find that the plaintiff lacked standing to appeal from the board's decision. We address only the merits argued in the plaintiff's brief and conclude that the board's decision granting a modified special permit removing the conditions must be reconsidered by the board.

1. Background. a. Aiello's property. The plaintiff, Roger Aiello, owns fifteen acres of residentially zoned property in Braintree, located directly north of the commercially zoned locus. Aiello's property consists of a number of parcels; in addition to single and multifamily residential units, it contains a prior nonconforming catering business and a "semi-agricultural use," a goat pasture. One of Aiello's single-family residences is located within eleven feet of the locus's northern boundary. Aiello's property is at a higher elevation than the locus. The judge found that the Aiello property has a clear view of the structure on the locus and portions of the parking area. The farther away one stands from the boundary line, the more visible the locus becomes.

b. <u>The locus</u>. The locus, now owned by RMT Braintree, LLC, and occupied by McCourt Construction,[3] contains approximately nine acres and is located in both the commercial and watershed protection districts.[4] The locus is long (approximately 2,000 feet), running from east to west, and narrow (approximately 200 feet). It currently is improved with a 675-foot-long commercial structure (sometimes referred to as building). Development of the rear, or western end, of the locus, is limited by the presence of wetlands. With only thirteen feet between the building and the locus's southern boundary, there is no parking or access along the southern side of the building where the locus abuts other commercial property.[5]

Access from the public way is on the eastern end, or "front," of the locus, and pavement covers most of the eastern and northern portions of the locus. West of the structure, approximately forty-five feet are paved before the wetlands begin. For many years, parking has been directly along the eastern and northern sides of the building. Vehicular traffic

---

[3] We refer to RMT Braintree, LLC, and McCourt Construction collectively as McCourt.

[4] Issues related to the watershed protection district have not been pursued on appeal, and we consider them waived.

[5] The relevant zoning by-law requires a minimum of twenty feet for side setbacks.

traditionally has run between the row of cars along the building and the northern line of the parking area.

c. The buffer zone. There are seventy-two feet between the building and McCourt's northern boundary with Aiello.  Thus, the entirety of the exterior to the north and twenty-eight feet of the interior of the building are within the 100-foot buffer between commercial and residential zones required by Braintree's zoning by-law (by-law), as set forth in the footnote.[6]  The by-law's buffer zone provisions protect residential abutters in several important ways.  They provide a generous distance buffer of 100 feet and severely restricts use of the buffer for anything other than access and passive recreation.  Parking lots, for example, are prohibited, along with even passive recreational uses that reduce "the effectiveness of the transition area as a year-round screen."  In addition, the by-

---

[6] The buffer zone by-law provides in part that no building in a commercial district shall be erected or placed within 100 feet of any residential zone.  By-law § 135702(B)(1)(a) (2003).  Section 135-702(B)(11) of the by-law further substantially restricts use of the buffer zone by providing as follows:  "Only necessary driveways or interior drives shall be located across a required transition area.  No structure, parking area, play area, interior street or driveway may be located in this transition area.  A transition area may be used for passive recreation; it may contain pedestrian, bike or equestrian trails, provided they do not reduce the effectiveness of the transition area as a year-round visual screen.  No other uses are permitted in transition areas."

law, with remarkable particularity, guides in great detail the composition of the required landscape buffer.[7]

A special permit may be granted modifying the buffer and landscape requirements where, "due to the size, shape or topography of a lot, the strict provisions of [the by-law] would reduce the usable area of a lot so as to preclude a reasonable use of the lot . . . where the side of a building, a barrier, and/or the land between the building and the lot line has been specifically designed, through a combination of architectural and landscaping techniques, to minimize potential adverse impacts on abutting lots."  By-law § 135-702(B)(12) (2003).  The special permit granting authority must consider, as pertinent here, "(a) [p]roximity to a residential development, (b) [t]opography of the site and the adjacent property, (c) [n]ature of the use and/or activity on the site, (d) [l]and use of adjacent property, . . . [and] (f) [p]otential for impact of any nuisance activities such as noise, light, or glare."  Ibid.

---

[7] A subsection of the by-law entitled "[c]omposition of buffer zones" states that "[a] buffer zone shall consist of a landscaped strip and may include fences, walls or berms which shall serve to provide an effective year-round visual screen at the time of installation."  By-law § 135-702(B)(2).  The by-law goes on to lay out how the vegetated "visual screen" is to be constructed; for example, it specifies the type, width, height, and spacing of the plant materials that must be used.  By-law § 135-702(B)(3), (5)-(7).  It also makes clear that while walls and fences can be used "to supplement the required planting to provide an effective visual screen," they "may not be substituted for plant materials to reduce the required width of a transition and screening area."  By-law § 135-702(B)(9).

d. <u>1994 special permit</u>. The locus has the benefit of several variances and special permits allowing additions to the commercial building over the years, but we are principally concerned with the 1994 special permit, which is what McCourt seeks to modify. In March of 1994, when the locus was owned and occupied by the former owner, Ainslie Corporation (Ainslie), the board granted a special permit and site plan review approving a proposed 3,750 square foot addition subject to thirty-four conditions.[8] Condition 18 restricted the use of the addition to storage only and condition 31 prohibited permanent outdoor storage of materials or equipment.[9] In addition, condition 34 required the "applicant/owner" to "take appropriate actions to minimize noise generated from the facility that may result in disruption to the abutting residential neighborhood." There was

---

[8] Prior to the board's consideration of the special permit application, in January, 1994, the zoning board of appeals of Braintree granted Ainslie a variance from the 100-foot buffer zone requirement to alter the existing nonconforming structure (due to reduced side-yard setback) by adding a 3,750 square foot addition for the purpose of storing material and equipment. The addition was to encroach northerly twenty-eight feet into the buffer zone, the same distance as the rest of the building. The 1994 variance decision noted that the addition was to be used for storage of materials and equipment, would be enclosed, and should have no adverse effect on the resident to the north.

[9] Prior to the 1994 addition, Ainslie had maintained two twenty-foot storage containers for aluminum and steel raw materials outside. In addition, some assembly occurred outside in the area of the addition.

no appeal from the 1994 variance (see note 8, supra) or special permit.

e. Ainslie's post-1994 use. Ainslie, or a related entity, had owned and occupied the locus since 1959 and, following the 1994 special permit, continued to occupy the locus and engineer and manufacture products through 2003. The northern parking lot accommodated 80 to 126 employee vehicles. The judge found that "[i]n connection with its business, Ainslie received at [the l]ocus deliveries of aluminum, steel and other raw materials. Platform trucks also entered and exited [the l]ocus to reclaim waste and materials used as part of the manufacturing process. Trucks often drove the length of the northerly paved area of [the l]ocus to gain access to a rear loading area." There was no evidence that noise from the uses inside the commercial structure could be heard outside the structure. So far as the record reflects, Aiello never complained to Ainslie or to the town about Ainslie's uses of the locus.[10]

f. McCourt's use. McCourt, a large contractor, became a tenant of the locus in 2003. McCourt immediately began using the northern parking lot as a contractor's yard for storage of

---

[10] Aiello testified that Ainslie never bothered him and he never bothered Ainslie. Eric Sandquist, the president of Ainslie, did not recall Aiello or anyone else making any complaints.

vehicles,[11] materials, and equipment, and used the structure, including the 1994 addition, as a nonresidential garage for repair of its vehicles and equipment. Also, according to Aiello, a bus company rented space and conducted all kinds of repairs in the building and outside, along his boundary. Aiello testified he could see and hear the various industrial vehicles and materials -- including backhoes, buckets, bulldozers, excavators, construction equipment and their back-up alarms -- and the dropping of metal plates from his property. He further testified that the visual impact, noise, and fumes caused him to complain to authorities on multiple occasions. Aiello described the conditions as "brutal," prompting him to erect a stockade fence in an effort to abate the conditions.[12]

g. 2009 modification. In 2008, McCourt filed an application for a special permit to modify the 1994 special permit by removing conditions 18, which restricted the use of the addition to storage only, and 31, which prohibited permanent outdoor storage. In its application, McCourt admitted that it

---

[11] McCourt represented to the board that it operates four "track dozers," eight "track excavators," three "vibrator rollers," and one "off-road water tanker." In addition, McCourt owns twenty-seven pieces of "medium-sized equipment," including two "small track excavators," six "wheel excavators," ten "wheel loader backhoes," one "wheeled crane," seven "wheeled loaders," and one "wheeled motor grader."

[12] The judge neither credited nor discredited Aiello's testimony, but we infer from her ultimate findings that she did not perceive conditions to be as "brutal" as Aiello described.

had used the locus for outdoor storage of equipment and supplies and the parking of wheeled or tracked equipment until directed to cease these activities by the building inspector.  The application further concedes that over the course of 2007, the building inspector's office informed him that the parking of construction vehicles and equipment in the parking lot violated the 1994 special permit condition prohibiting permanent outdoor storage of materials or equipment, and the use of the 1994 addition to repair construction vehicles and equipment violated the 1994 special permit.[13]  McCourt characterized its modification request as seeking to allow "(i) minor adjustments to the striping of the existing on site paved parking area so as to provide designated parking of over-sized wheel and tracked vehicles and small equipment trailers [along the northern boundary]; (ii) exterior permanent storage of construction equipment and supplies within a clearly designated 2,040 square

---

[13] Evidence of enforcement actions and settlements related to these alleged violations was precluded.  The judge found, however, that McCourt was cited and fined by the building inspector for violating the 1994 special permit and that related enforcement actions resulted in a settlement agreement entered into by McCourt and the mayor of Braintree in February of 2009, while McCourt's 2008 application to modify the 1994 special permit was pending.  McCourt did not admit liability but agreed to pay a $15,000 fine and agreed to change the principal place of garaging its vehicles to Braintree so that the town would benefit from the excise taxes.  The town's direct financial stake in allowing McCourt to operate its business on the locus, particularly where the enforcement proceedings involved the very same uses allowed by the special permit, is the basis for Aiello's bias claim discussed below.

foot area located more than 100 feet from the northern property line; and (iii) the use of an existing 3,750 square foot portion of the building [the portion allowed pursuant to the 1994 variance and special permit] for the maintenance and repair of construction vehicles." In addition to parking oversized vehicles and storing small equipment and trailers on the northern line of the parking area, the proposed plan also shows an area for storage of snow removed from the parking areas along the northern property line.

Although McCourt's stated practice and preference is to repair and maintain equipment on worksites, it represented that, on average, it would have a maximum of two large vehicles "inside the building and [two parked] in the over-sized spaces [along the northern boundary line] awaiting service/repair." McCourt also expected to have a maximum of five pieces of smaller equipment on site at any given time with two in the building being serviced and three pieces stored outside.

The board, considering the modification request pursuant to the special permit provisions in the watershed protection district section of the by-law, § 135-609(F)(2), and the buffer zone provision, § 135-702(B)(12), allowed the request for modification on September 16, 2009. With regard to the buffer zone requirements, the board found that "the residentially zoned abutting land to the north is used for single/multi family

residential, catering, equipment storage and semi-agricultural uses, unlike the rest of the Residential A and B Zoned neighborhood that is predominantly single family dwellings." The board characterized the uses proposed by McCourt as "contractor's yard, light manufacturing, non-residential garage, and automotive repair," and noted that they are "by-right" uses in the commercial district. Removal of the restriction is justified, the board reasoned, because the "owner/operator does not have the interior storage needs of the previous tenant." The board found that the exterior storage needs were "minimal" within the buffer zone and would "be restricted to the designated areas within the existing pavement/parking areas." In addition, "due to the location of the previously approved parking layout," the board found that "a majority of the site will be screened with . . . fencing [and some areas] will be further landscaped with infill plantings." The board further found that the predominate use of the buffer zone remained "parking, circulation and interior commercial space," which have "exist[ed] on site in some form since the 1980's." The board found that "the usage of the building as modified is a continuation of the by-right uses that exist on site today, pursuant to the Zoning Board of Appeals April 2004 Decision,"[14]

---

[14] In 2004, the board of appeals granted approval pursuant to G. L. c. 40A, § 6, to allow the installation of interior

and "[t]he operation of vehicles, equipment, devices and tools will be conducted in accordance with Article XI [of the by-law -- environmental performance standards including emissions and noise controls --] and shall not exceed [the noise level] as noted within the Zoning Bylaw." The board found that McCourt's "participation in an emission reduction program resulted in the installation of diesel oxidation catalysts or diesel particulate filters in 61 pieces of their equipment to ensure cleaner vehicle emissions," and "[t]he measures taken meet and/or exceed the contract requirements for several state agencies." Finally, the board concluded that the potential for any nuisance is minimal.

The board deleted condition 18 and replaced it with conditions 18a-c, which allowed McCourt to use the entire building, including the 1994 addition, for all "uses allowed by right within the commercial zoning district," but imposed a condition that the overhead doors must be closed if a use generates noise that can be heard outside of the building walls. In addition, conditions 18b and c prohibit exterior repair,

_____

partitions inside the structure to divide it into five tenant spaces with overhead doors on the north side of the building, facing the Aiello property. The board of appeals "found that the proposal [would] not be substantially more detrimental to the neighborhood because the alterations will not alter the footprint of the building." Aiello did not appeal from this decision. Nothing in the 2004 approval impacted the conditions contained in the 1994 special permit.

maintenance, and washing of vehicles or equipment.  The board also deleted condition 31 and replaced it with language that allowed exterior storage of material and equipment in a 2,080 square foot area, "five dedicated spaces for oversized wheel and track mounted equipment," and a 989 square foot area for small equipment and trailer parking.

On appeal to the Land Court for de novo review, the judge took a view, conducted a seven-day trial, and concluded that Aiello lacked standing to appeal.  She reasoned that the noise and odors coming from the locus are the result of the uses allowed for decades either by right or specifically allowed pursuant to the decisions of the board, including the 1994 special permit.  She concluded that Aiello was unable to credibly distinguish between harm that flows from the changes allowed by the 2009 modification and harm that flows from uses allowed prior to its issuance.  The judge also concluded that the condition of closing the garage doors and prohibition of washing vehicles, not previously in effect, should decrease noise from the premodification uses.  With regard to visual impact, the judge concluded that Aiello lacked standing to appeal the board's decision because "the difference in visual impact before and after the 2009 Modification is negligible, and therefore, the harm, if any, is de minimis."

Despite her conclusion that Aiello lacked standing, the judge nonetheless reached the merits and concluded that the screening proposed by McCourt, an eight-foot-tall opaque fence and plantings in some places,[15] did not satisfy the by-law requirements.  She found that the higher elevation of Aiello's property provides visibility of the parking areas and commercial structure on the locus from several vantage points and that the fence provides effective screening only for people standing within a few yards of it.  The judge found that if Aiello had standing, she "would have remanded the buffer zone issue to the board for further consideration of screening based on the facts found at trial."  She rejected McCourt's argument that the required vegetative screen could be waived because of "the difficulty of growing trees and shrubs in a narrow, sloped area" of the locus, finding, based on the testimony of Aiello's expert, that "there are methods through which [McCourt] could provide screening with vegetation and/or a wall that functions as a raised bed for plantings which would provide screening compliant with the   By-law without 'reduc[ing] the useable area of [the locus] so as to preclude a reasonable use of the lot.'"  In all other regards, the judge stated she would have affirmed on the merits.

---

[15] Our review of the site plan suggests plantings were required at the eastern end of the locus.  It does not appear that plantings were required along the boundary with Aiello.

Discussion. 1. Standing. Any person aggrieved by a decision of a zoning board granting a special permit has standing to appeal from that decision. G. L. c. 40A, § 17. "A plaintiff qualifies as a 'person aggrieved' upon a showing that his or her legal rights will be infringed by the board's action." Butler v. Waltham, 63 Mass. App. Ct. 435, 440 (2005). "Of particular importance, the right or interest asserted by a plaintiff claiming aggrievement must be one that the Zoning Act is intended to protect, either explicitly or implicitly." 81 Spooner Rd., LLC v. Zoning Bd. of Appeals of Brookline, 461 Mass. 692, 700 (2012). Here, the judge found that "the various provisions of the By-laws, read together, . . . instruct that visual impact is an interest protected under the By-laws which may be used as a ground to support standing." McCourt does not argue otherwise on appeal, and we agree that the regulatory scheme makes it clear that visual impact is an interest protected by the by-law. Nothing in Kenner v. Zoning Bd. of Appeals of Chatham, 459 Mass. 115 (2011), is to the contrary.[16]

---

[16] In order to have standing to appeal from the board's decision, Aiello need satisfy his burden as to only one interest. 81 Spooner Rd., LLC, 461 Mass. at 704 n.16. We focus, as the judge did, on the visual impact of the board's decision but note that it is difficult in this context to separate the visual impact from the accompanying auditory impact inherent in the use of the locus as a contractor's yard. We reserve for later in the opinion comment on the auditory impact.

That Aiello has articulated an interest or interests protected under the by-law does not end the inquiry. "Whether a party is 'aggrieved' is a matter of degree and the variety of circumstances which may arise seems to call for the exercise of discretion rather than the imposition of an inflexible rule." Kenner, supra at 119, quoting from Paulding v. Bruins, 18 Mass. App. Ct. 707, 709 (1984). Abutters enjoy a presumption of standing but "an adverse party can challenge an abutter's presumption of standing by offering evidence 'warranting a finding contrary to the presumed fact.'" 81 Spooner Rd., LLC, 461 Mass. at 700. "[W]here an abutter has alleged harm to an interest protected by the zoning laws, a defendant can rebut the presumption of standing by coming forward with credible affirmative evidence that refutes the presumption" (emphasis in original), for example, with expert evidence "establishing that an abutter's allegations of harm are unfounded or de minimis." Id. at 702. "The adverse effect on a plaintiff must be substantial enough to constitute actual aggrievement such that there can be no question that the plaintiff should be afforded the opportunity to seek a remedy. Put slightly differently, the analysis is whether the plaintiffs have put forth credible evidence to show that they will be injured or harmed by proposed changes to an abutting property, not whether they simply will be 'impacted' by such changes." Picard v. Zoning Bd. of Appeals of

Westminster, 474 Mass. 570, 573 (2016), quoting from Kenner, 459 Mass. at 122. A judge's finding on standing will not be disturbed unless clearly erroneous. Kenner, 459 Mass. at 119.

Here, the judge concluded that McCourt rebutted Aiello's presumption of standing and, as noted above, found that Aiello has failed to overcome McCourt's challenge to his allegation of harm because the visual impact of the 2009 modification, compared to premodification impact, is de minimis. The judge's focus on the incremental harm between the use after the 1994 special permit and the use after removal of the conditions was misplaced. We said in Chambers v. Building Inspector of Peabody, 40 Mass. App. Ct. 762, 768 (1996), that to show standing to challenge a zoning decision, a plaintiff should not be "required to show evidence of harm to [his] property or legal interests caused by the modifications to the site plan that exceeded the over-all harm stemming from the project as originally approved." Such a requirement is "inconsistent with the principle that the term '"person aggrieved" should not be construed narrowly.'" Ibid., quoting from Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719, 722 (1996). Thus, analysis of whether the board's decision will have only a de minimis impact on Aiello's property is not limited to harm caused by the modifications that exceeded the over-all harm stemming from the project as originally approved in 1994.

"[W]e think that the board's power to remove the conditions is most appropriately analyzed in terms of the nature and effect of the condition itself and in light of the statutory concerns relevant to the grant" of a buffer zone special permit. Huntington v. Zoning Bd. of Appeals of Hadley, 12 Mass. App. Ct. 710, 714-715 (1981) (discussing modification of variance). Here, the conditions imposed in the 1994 special permit ameliorated the impacts from further encroachment into the buffer zone by a nearly 4,000 square foot addition to the already nonconforming building. Aiello benefited because exterior storage was moved inside the new addition and the addition was limited to storage only with the added protection of a prohibition of exterior storage. Now, McCourt proposes to both use the encroaching addition for active servicing of vehicles and equipment rather than storage, and add exterior storage of vehicles and equipment into the buffer.

We have recognized that "crowding of an abutter's residential property by violation of the density provisions of the zoning by-law will generally constitute harm sufficiently perceptible and personal to qualify the abutter as aggrieved and thereby confer standing to maintain a zoning appeal." Sheppard v. Zoning Bd. of Appeal of Boston, 74 Mass. App. Ct. 8, 12 (2009), quoting from Dwyer v. Gallo, 73 Mass. App. Ct. 292, 297 (2008). While the density provisions of the by-law are not at

issue here and no new structures are proposed, the buffer zone provisions in the by-law provide similar protections from potentially harmful uses as the density provisions considered in Sheppard and Dwyer.  The buffer zone requirements are intended to protect the residential abutter from the sights and sounds of abutting commercial uses.  Here, none of the proposed storage uses, the parking of oversized vehicles, or the operation of a garage is a use permitted as of right in the buffer zone.  The building inspector's comments on the proposed modification best illustrate Aiello's potential harm from the removal of the conditions:  "it should be noted that [the locus] already enjoys a reduced physical separation between [the] industrial operation and its residential neighbors from what is required under Town Zoning Bylaws . . . .  The request by the applicant to store two large pieces of equipment in what is described as 'oversized spaces' . . . would possibly . . . be problematic to the residential abutters.  Aside from the immediacy of this location to residential property in terms of the aesthetic impact for which the buffer zone was intended, the related exhaust and noise that invariably accompanies the movement and placement of this apparatus could be an additional burden to the abutters and quite possibly result in a violation of environmental standards under Article XI of the Town Zoning Bylaws."  The building inspector also articulated similar concerns about the noise

associated with the change in use of the 1994 addition and the noise, exhaust, and aesthetics associated with the proposed equipment storage. He seemingly recommended at least imposing the condition that the overhead doors be closed.

In contrast to other proposed special permits, where a board and a reviewing judge must do their best to predict impacts of proposed changes based on the evidence, here McCourt admitted in its application that it had been using the property in a manner that violated the two conditions it seeks to have removed.[17] Those uses prompted complaints of noise, odors, and visual impacts from Aiello and caused him to install a fence in an effort to reduce the impact. The building inspector's concerns, though articulated as possibilities, became reality according to Aiello.

While it is unclear how much of Aiello's testimony the judge credited, she did find that Aiello will be able to see the many pieces of equipment stored and oversized vehicles parked

_____

[17] McCourt cites Dowd v. Board of Appeals of Dover, 5 Mass. App. Ct. 148 (1977), for the broad proposition that consideration of McCourt's prior "unlawful" activities is not permitted in reaching a decision on a zoning request. However, Dowd holds simply that a board may not refuse, because of an applicant's past history of zoning infractions, to consider whether a use may be appropriately conditioned to become a permitted use. Id. at 155-157. Dowd does not require a board or court to ignore known impacts of "unlawful" activities previously conducted on the property when considering whether to authorize those same activities by way of a discretionary special permit.

outside from many points on his property and that the fence required by the special permit is inadequate to buffer the view. As Aiello claims, the judge's findings satisfy Aiello's burden to "show that the zoning relief granted adversely affected [him] directly" and that his harm is more than de minimis, given the stated concerns of the by-law. See Sheppard v. Zoning Bd. of Appeal of Boston, 81 Mass. App. Ct. 394, 397 n.6 (2012) (distinguishing finding of no standing in Kenner, supra, where allegation was that seven-foot-taller home would affect plaintiff's view of ocean and visual character of neighborhood, from allegation of harm from replacing prior nonconforming structure with new, larger home in crowded urban neighborhood). See also Martin v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 434 Mass. 141, 145-147 (2001) (abutter has standing to appeal zoning decision where judge found towering steeple would be visible from most, if not all, of abutter's property). We conclude that this case is closer to Sheppard and Martin than Kenner.

While the visual impact of the board's decision is sufficient in and of itself to confer standing, it is difficult to consider it separately from the noise associated with the unloading of metal plates, buckets, and barriers, and movement of construction vehicles and equipment associated with use of the buffer as a contractor's yard. As we construe the

regulations, noise impact is also an interest sought to be protected by the buffer zone requirements and site plan review.[18] The judge found that "noise and odors . . . do and will emanate from the commercial uses on [the l]ocus." Her conclusion that the noise impacts do not confer standing is based in part on her misapprehension that her review was limited to the incremental difference between pre- and postmodification changes. The noise impact from use of the parking area as a contractor's yard with all of the attendant noise associated with the movement of vehicles and materials is more than de minimis. We conclude that the noise impact contributes to Aiello's standing to appeal from the board's decision removing the conditions contained in the 1994 special permit. The judge's finding that Aiello lacks standing was error.

----

[18] We do not agree with the judge's rationale for concluding that Aiello's complaints of noise and odors do not give him standing. The judge found that Aiello testified that noise and odors were present since at least 2003 when McCourt first moved onto the locus and concluded that they, therefore, cannot be tied to the 2009 modification and form the basis of his aggrievement. That the postmodification uses will be substantially the same as McCourt's admitted initial, unauthorized use of the locus cannot refute Aiello's claims of harm. Moreover, while the condition that the overhead doors be closed should help, most of Aiello's complaints stemmed from the use of the exterior portions of the buffer zone. Exterior washing and repair of vehicles are not uses allowed in the buffer zone under the by-law; thus, the condition prohibiting those uses is of no added benefit to Aiello. Finally, that noise from other nearby commercial properties reaches Aiello's property militates in favor of a more strictly enforced buffer zone, not the relaxation of the buffer zone requirements.

2.  Merits.  "In exercising its power of review, the court must find the facts de novo and give no weight to those the board has found."  Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68, 72 (2003).  In reviewing the local zoning board's denial of a special permit, "the court determines the content and meaning of statutes and by-laws and then decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or deny the . . . special permit application."  Id. at 73.  "In the end, the court must affirm the board's decision unless it finds that denial of the application was 'based on a legally untenable ground, or [was] unreasonable, whimsical, capricious or arbitrary.'"  Id. at 72, quoting from MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 639 (1970).

a.  Visual impact.  The judge found that the board required McCourt to

> "install an eight-foot high opaque vinyl fence running along the northern boundary line in place of the six-foot chain link fence that had been in that location for many years.  The fence was a replacement for trees, not something the Board required in addition to them.  Despite the eight-foot fence, the higher elevation of the Aiello Property provides visibility of the parking areas and the structure on the locus from several high vantage points; essentially, an individual standing on much of the Aiello Property has a view over the fence.  The current fencing provides effective screening of the parking areas of [the locus] only for people standing within a few yards of it on the Aiello side."

On the basis of expert testimony, the judge concluded that methods exist through which McCourt could have provided "screen[ing] with vegetation and/or a wall that functions as a raised bed for plantings which would provide screening compliant with the By-laws without reducing the useable area of [the l]ocus so as to preclude a reasonable use of the lot." As the judge concluded, the fencing is inadequate to meet the requirements of the landscape and buffer zone regulations or to satisfy the criteria relevant to exceptions from the buffer zone requirements. As McCourt does not argue on appeal that the judge's decision on the merits with regard to visual impact was wrong, we agree with the judge that the board must reconsider the allowance of the special permit modification in light of this decision. We comment briefly on the other issues raised by Aiello that may arise on reconsideration.

b. <u>Fire lane</u>. The judge found that the fire chief has the legal authority to determine where a fire lane should be located on a site. 527 Code Mass. Regs. § 10.02 (1997).[19] The judge further found that the parties agreed "that the Fire Chief is the final arbiter over fire safety concerns" and that "the Board cannot divest the Fire Chief of his authority under the Fire Regulations." A memo from the fire chief dated May 27, 2009,

---

[19] The "fire regulations" relied on by the judge and the parties have since been amended.

required that the fire department have access to the east and north sides of the building. The fire chief required that the lanes be designated, free of obstructions, and maintained pursuant to 527 Code Mass. Regs. § 10.03(10) (1997). The judge further found that the fire chief orally clarified to the town planner that he wanted the fire lane located directly adjacent to the structure on the northern side.[20]

Contrary to the fire chief's direction that fire lanes abut the eastern and northern sides of the commercial structure, the board approved the site plan with a fire lane in the travel lane of the parking lot, with a row of cars directly abutting the northern side of the building. The judge credited the board chairman's testimony that he learned from a private conversation with the fire chief that the fire chief had "personal animosity" toward a McCourt employee. The judge found that the chairman credibly testified that he concluded that the fire chief's requirement "was the result of a personal feud" and not "legitimate reasoning." The judge further found that "[t]he current Fire Chief has not indicated the fire lane must be adjacent to the Structure or otherwise relocated, nor submitted anything in writing regarding the approval of the 2009 Modification." Finally, the judge concluded that the board's

---

[20] Placement of the fire lane along the building, the judge found, "would have required the removal of many existing parking spaces and installed structures."

decision was not legally untenable, unreasonable, arbitrary, or capricious. We disagree.

Where the parties agree that the fire chief controls the location of the fire lane, the board was without legal authority to approve the site plan with the fire lane in a location different from that established by the fire chief. Information the chairman learned in a private conversation outside the public hearing cannot justify rejecting the fire chief's decision. That the current fire chief has not taken action to enforce the former fire chief's position is not equivalent to demonstrating that the board's decision was made on legally tenable grounds. The board shall reconsider the location of the fire lane on the site plan, and in doing so may wish to solicit the current fire chief's view of the former fire chief's May 27, 2009, determination and subsequent oral communication with the town planner.

c. <u>Bias</u>. The record established that during some of the hearings on McCourt's application for modification, but not when the vote was taken, one of the board members, in his capacity as a consultant with the Massachusetts Bay Transportation Authority (MBTA), controlled final payments to McCourt on a contract McCourt had with the MBTA. By the time he voted on McCourt's application, the member no longer had a relationship with the MBTA. He testified at trial that he had no personal

relationship with McCourt, and that he did not disclose the work relationship because the project had been substantially completed in 2006 and only final details were outstanding. While full disclosure would have been the more proper option, we agree with the judge that there was no evidence of bias.

Aiello also contends that the board was aware that McCourt had reached a settlement on the zoning enforcement matters that obligated McCourt to register certain vehicles and equipment in Braintree and that approval of the special permit was necessary for McCourt to do so. The judge found, however, that the chairman of the board credibly testified that the settlement was not discussed by the board and played no role in its decision. Based as it is on the judge's credibility assessment, we will not disturb her finding that Aiello failed to show that the board inappropriately considered the settlement agreement in deciding whether to grant the modifications.

Conclusion. It was error for the judge to conclude that Aiello lacked standing. The judgment is vacated, and the matter is remanded for the entry of an order requiring the board to reconsider the allowance of McCourt's 2008 application for a special permit. We note that the by-law provides that exceptions from the buffer requirements may be allowed by special permit where, because of the lot's shape, among other things, to deny exceptions would prohibit a reasonable use of

the locus.  The long, narrow shape of the lot historically has justified limited use of the buffer zone for a portion of the commercial structure and for employee parking that has enabled successful commercial use of the locus.  We expect that any decision by the board on remand will consider whether McCourt meets the threshold criteria for the proposed additional exceptions to the buffer requirements.

<u>So ordered</u>.

MILKEY, J. (concurring).  Relying principally on our decision in Chambers v. Building Inspector of Peabody, 40 Mass. App. Ct. 762, 768 (1996), the majority concludes that the plaintiff (abutter) had standing.  While I wholeheartedly agree with that conclusion, I write separately to highlight that we could arrive there by a shorter and surer route.  As explained below, even if the judge was correct to view her job as hazarding a "before and after" comparison of the impact of the board's decision, the judge's own findings demonstrate how the abutter had standing.

As the majority accurately observes, in assessing the adverse visual impact at issue, the judge compared the impact from the proposed use of the locus to the impact from uses already allowed by the 1994 special permit.  Based on that comparison, she found any such additional impact to be negligible (in the lexicon of the standing case law, "de minimis").  After all, the judge reasoned, the particular area in question already long had been used for extensive car and truck parking, so how would parking heavy equipment there cause appreciably worse visual impact?

The majority faults the judge for requiring that the abutter demonstrate that the modification to the special permit caused an incremental increase in harm to him.  See ante at ___, citing Chambers, 40 Mass. App. Ct. at 768.  To my mind, there

was an independent problem in the point of comparison that the judge employed.  It is important to keep in mind that the abutter is challenging the decision made by the planning board (board), not the actions of the owner of the locus or its tenant, McCourt Construction (McCourt).  See Butler v. Waltham, 63 Mass. App. Ct. 435, 440 (2005) ("A plaintiff qualifies as a 'person aggrieved' upon a showing that his or her legal rights will be infringed by the board's action").  The standing question thus turns on how the board's decision would affect the abutter, not on whether any proposed changes to the use of the locus by McCourt would make the attendant visual impact appreciably worse.  In the context of this case, that distinction matters.[1]  Here, as the judge herself expressly concluded, the board's decision deprived the abutter of something to which he was entitled under the buffer zone by-law: an effective visual screen to shield his property from McCourt's uses.  The deprivation of that mandated mitigation measure caused the abutter harm, regardless of whether the adverse

---

[1] In many cases involving challenges to agency approvals of proposed development projects, it would not make a difference whether the focus was on the impact of the project or on the impact of the agency decision.  Therefore, unsurprisingly, some cases use the shorthand of referring only to the former.  See Picard v. Zoning Bd. of Appeals of Westminster, 474 Mass. 570, 573 (2016) (referring to standing analysis as asking "whether the plaintiffs have put forth credible evidence to show that they will be injured or harmed by proposed changes to an abutting property, not whether they simply will be 'impacted' by such changes" [quotation omitted]).

visual impact of McCourt's proposed use was greater than that of the prior owner.[2]

Of course, as a matter of black letter law, "[t]he language of a bylaw cannot be sufficient in itself to confer standing: the creation of a protected interest (by statute, ordinance, bylaw, or otherwise) cannot be conflated with the additional, individualized requirements that establish standing." Sweenie v. A.L. Prime Energy Consultants, 451 Mass. 539, 545 (2008). Thus, where, as here, plaintiffs are able to demonstrate that visual interests are protected by a zoning by-law, they additionally must "produc[e] evidence of the actual visible

---

[2] As this case illustrates, the denial of a benefit expressly conferred upon an identified class itself provides standing. This principle is perhaps best illustrated in other contexts. For example, someone who alleged that a government agency improperly denied her a means-based public benefit for which she qualified by statute has standing to challenge that denial, see Goldberg v. Kelly, 397 U.S. 254, 260-263 (1970); it matters not at all that the denial of the benefit made the plaintiff no poorer than she had been before. However, the principle is also recognized in existing zoning case law where the benefits conferred upon abutters are far less overt than the one in the case before us. For example, "[a]n abutter has a well-recognized legal interest in 'preventing further construction in a district in which existing development is already more dense than the applicable zoning regulations allow.'" Sheppard v. Zoning Bd. of Appeal of Boston, 74 Mass. App. Ct. 8, 11 (2009), quoting from Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 31 (2006). In light of such interests, "crowding of an abutter's residential property by violation of the density provisions of the zoning by-law will generally constitute harm sufficiently perceptible and personal to qualify the abutter as aggrieved and thereby confer standing to maintain a zoning appeal." Dwyer v. Gallo, 73 Mass. App. Ct. 292, 297 (2008).

impact on their property." Ibid. That threshold requirement is easily satisfied here, because the judge herself found that the presence or absence of the mandated visual screen directly affected the abutter. Specifically, after viewing the property, the judge concluded that the limited screening required by the board did not provide an adequate substitute for the specific type of vegetative screening mandated by the by-law, explaining her reasoning as follows:

> "Despite the eight-foot fence [which had been constructed by the time of the view], the higher elevation of the [abutter's] Property provides visibility of the parking area and the Structure on Locus from several high vantage points; essentially, an individual standing on much of the [abutter's] Property has a view over the fence. The current fencing provides effective screening of the parking areas of Locus only for people standing within a few yards of it on the [abutter's] side."

Thus, the judge's own findings demonstrate that the abutter had a direct and substantial interest in the board's allowance of the modification of the special permit without requiring the specifically-mandated visual screen.[3]

---

[3] In light of the judge's findings with regard to the inadequacy of the substitute screening, it is evident that the judge did not mean that she considered the abutter's having to look at the stored heavy equipment to be inconsequential. Moreover, if this had been what the judge intended by her de minimis finding, then this ultimate finding would have been clearly erroneous. See Sheppard v. Zoning Bd. of Appeal of Boston, 81 Mass. App. Ct. 394, 403 n.18 (2012) (appellate courts not bound by ultimate findings that are inconsistent with subsidiary findings), citing Simon v. Weymouth Agric. & Industrial Soc., 389 Mass. 146, 151-152 (1983). In addition, such a ruling would fail for a more fundamental reason: it

Nothing in Kenner v. Zoning Bd. of Appeals of Chatham, 459 Mass. 115 (2011), on which McCourt relies, is to the contrary. The court there concluded that the by-law at issue was not designed to protect individual homeowners' views, but instead served to protect only "the visual character of the neighborhood as a whole" (emphasis in original). Id. at 121. The court thus held that to establish standing, the plaintiffs had to show both "a particularized harm to the plaintiff[s'] own property and a detrimental impact on the neighborhood's visual character." Ibid.[4] The context of the case before us could not be more different. Far from generally endorsing the protection of the visual character of neighborhoods, the by-law here mandated that specific screening measures be taken to protect the views of a defined group of property owners.

_____

would not have been up to the judge to interject her own judgment as to whether the screening requirement set forth in the by-law was worth enforcing. The town's legislative body has made that judgment, and neither the judge nor the board could override it. Cf. Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 382 (2009) ("[a]lthough the judge determines the facts, it is the [local body's] evaluation of the seriousness of the problem, not the judge's, which is controlling" [quotation omitted]).

[4] As to the first, the court in Kenner held that the trial judge's finding that the slightly taller neighboring structure would have only a de minimis impact on the plaintiffs' view of the ocean was not clearly erroneous. 459 Mass. at 123. Regarding the second, the court ruled that the plaintiffs supplied no evidence of the visual impacts on the neighborhood "[a]part from [their] unsubstantiated claims and personal opinions." Id. at 121.

In sum, the judge's own findings demonstrate that the abutter had a significant and direct stake in challenging the board's decision.  Therefore, reversal of the judge's ruling on standing is required without the need to invoke the holding in Chambers, 40 Mass. App. Ct. at 768.