WINCHESTER BOAT CLUB, INC. vs. ZONING BOARD OF APPEALS OF WINCHESTER, MISC 17-000204

































 
 WINCHESTER BOAT CLUB, INC., Plaintiff, v. ZONING BOARD OF APPEALS OF WINCHESTER
 MISC 17-000204 
 APRIL 29, 2021
MIDDLESEX, ss.
FOSTER, J.
DECISION
With: 
MISC 17-000272 : WINCHESTER BOAT CLUB, INC., Plaintiff, v. LAWRENCE BEALS, DONNA JALBERT PATALANO, RICHARD L. SAMPSON, JR., DOROTHY R. SIMBOLI, JONATHAN GYORY, and KEVIN SARNEY, members of the Zoning Board of Appeals of Winchester, Defendants 
MISC 17-000366 : WINCHESTER BOAT CLUB, INC., Plaintiff, v. RICHARD NORSWORTHY, STEPHANIE and KEVIN SARNEY, KATHLEEN HO and TIMOTHY O'DONNELL, Intervenor-Defendants 
MISC 18-000517 : unknown parties 















 Introduction 





 Winchester Boat Club (WBC or Plaintiff) is a private boat club along Mystic Lake in Winchester. It sits on two adjoining parcels, one on Cambridge Street on which its main building sits, and the other on Everett Avenue which is open. The open space parcel between Everett Street and the lake has been a source of contention between WBC and the neighbors and the Town of Winchester for some years. WBC would like to build a pavilion or a boat shed on the parcel; the neighbors object, fearing the loss of their view, noise from WBC members, and increased traffic and parking on Everett Avenue and members walking through the open area. These consolidated actions are appeals of the Winchester Zoning Board of Appeals' denial of WBC applications to construct a pavilion, a boat shed, and landscaping on the open parcel. The pavilion appeal was largely decided on summary judgment, and WBC has conceded that judgment can enter affirming that decision. The other decisions were tried to me. As set forth below, applying the proper deference to the Zoning Board of Appeals and its findings, the denials of the boat shed and landscaping are affirmed. 





Procedural History 





17 MISC 000204 and 17 MISC 000272 





 WBC filed its complaint in 17 MISC 000204 (17-204 Complaint) on April 13, 2017, naming as defendants the Zoning Board of Appeals of Winchester and its members, Lawrence Beals, Joan E. Langsam, Richard L. Sampson, Jr., Dorothy R. Simboli, Jonathan Gyory, and Kevin Sarney (collectively, the Board). The 17-204 Complaint is an appeal pursuant to G.L. c. 40A, § 17, of the decision of the Board denying Petition No. 3798, issued on March 28, 2017. A case management conference was held on May 16, 2017. 





 The Plaintiff filed its Complaint in 17 MISC 000272 (17-272 Complaint) on May 17, 2017, naming as defendants the Board. The 17-272 Complaint is an appeal pursuant to G.L. c. 40A, § 17 of a supplemental decision of the Board issued on May 1, 2017 denying Petition No. 3798. On May 23, 2017, by agreement of the parties, 17 MISC 000204 was consolidated with 17 MISC 000272. On July 13, 2017, abutters Cheryl and Richard Norsworthy, Kathleen K. Ho and Timothy O'Donnell, and Stephanie and Kevin Sarney (collectively, the Intervenors) filed a Motion to Intervene as Party Defendants in Winchester Boat Club, Inc. Appeals of Rulings of Winchester Zoning Board, which was allowed by Memorandum and Order issued on July 26, 2017. On August 14, 2018, WBC filed Winchester Boat Club Inc.'s Motion to Consolidate, which was denied on August 28, 2018. Cheryl Norsworthy was dismissed as a party to this case on August 28, 2018. The pre-trial conference was held on October 18, 2018, after which the cases were consolidated. 





17 MISC 000366 





 WBC filed its complaint in this case (17-366 Complaint) on September 12, 2016, in the Middlesex Superior Court, naming as defendants the Board. The complaint is an appeal pursuant to G.L. c. 40A, § 17, of the Board's Decision No. 3767 issued on August 24, 2016, finding that a new special permit is required to construct WBC's requested pavilion, and denying WBC's application for a new special permit. 





 On April 18, 2017, WBC filed a Motion for Summary Judgment with supporting memoranda, and the Board filed its opposition. On the parties' joint motion filed May 5, 2017, Judge Hogan allowed the transfer of this case to the Land Court on June 1, 2017. On June 21, 2017, the Chief Justice of the Trial Court entered an Order to transfer this matter from the Middlesex Superior Court to the Land Court Department, and the present case was transferred to the Land Court on July 6, 2017, pursuant to G.L. c. 211B, § 9. 





 On July 13, 2017, a Motion of Abutters to Intervene as Party Defendants was filed. On July 20, 2017, a hearing on Plaintiff's Motion for Summary Judgment was held. The Motion of Abutters to Intervene was allowed on July 26, 2017, and the Intervenors subsequently filed an opposition to Plaintiff's Motion for Summary Judgment on August 7, 2017. On December 27, 2017, the court issued a Memorandum and Order Denying Plaintiff's Motion for Summary Judgment (Denial of Summary Judgment), finding that the scope of the 1991 Special Permit (defined below) does not grant WBC the right to build the requested pavilion on the Open Space Parcel (as defined below). On August 14, 2018, Plaintiff filed a Motion to Consolidate, which was denied on August 28, 2018, leaving related case 16 MISC 000688 to be treated as a companion case. The pre-trial conference was held on October 18, 2018, in which these cases were consolidated. 





18 MISC 000517 





 The plaintiff filed its complaint in this case on October 9, 2018 (18-517 Complaint), naming as defendants the Board. The 18-517 Complaint contains one claim, an appeal pursuant to G.L. c. 40A, § 17, of the Board's Decision No. 3856 issued on September 24, 2018, seeking (a) a determination that a special permit was not required to construct a boat shed on WBC's property, and (b) a determination that the Board's decision denying a request for a special permit was in error. On October 18, 2018, a pre-trial conference was held, and this case was consolidated with cases 17 MISC 000204, 17 MISC 000272, and 17 MISC 000366. 





Post-Consolidation 





 A hearing on Motions in Limine was held on January 30, 2019. The pre-trial conference was held on May 21, 2019. The motion in limine was heard on June 17, 2019. The court took a view on June 24, 2019. Trial was held on June 27 and 28, July 25 and 26, and on September 13, 2019. Exhibits 1- 14A, 14C-137, 138 de bene, 139-158, 76B-F, and 129B were marked, and Exhibits A-G were marked for identification. Testimony was heard from Lawrence Beals, James Bowers, Kevin Sarney, Susan Schwartz, James McGowan, Peter Wild, Christopher Mulhern, Stephanie Sarney, Audrey Bosse, Kathleen Ho, Richard Norsworthy, and Dorothy Simboli. On June 24, 2019, the first day of trial in related case 16 MISC 000688, WBC stipulated that it would not pursue its argument that the Board wrongly denied the pavilion, nor would it present any evidence in 17 MISC 000366 (the pavilion application appeal), but would instead reserve its rights to appeal the summary judgment decision that the special permit did not allow WBC to build the pavilion as a matter of right. See Transcript in Companion Case 16 MISC 000688 ("Ho Tr.") at 1-19-21. On June 27, 2019, the first day of trial in this case, the parties agreed to dismiss the 17-204 complaint, without prejudice. Tr. 1-74-76. On June 28, 2019, the second day of trial, the Board's motion to dismiss as moot the 17-272 complaint was denied without prejudice. Tr. 2- 71-73. On July 25, 2019, the third day of trial, both WBC's and the Intervenors' motions for mandatory dismissal were denied. Tr. 3-83, 3-145, 3-146. On July 26, 2019, the fourth day of trial, WBC's motion for mandatory dismissal was again denied. Tr. 4-164. 





 The Winchester Boat Club, Inc.'s Post-Trial Brief was filed on October 24, 2019, and both the Defendant Zoning Board of Appeals' Post-Trial Brief and the Plaintiff O'Donnells and Intervenors Post Trial Brief were filed on October 25, 2019. On October 31, 2019, the Winchester Boat Club, Inc.'s Consolidated Reply Brief was filed, as was the Defendant Zoning Board of Appeals' Post-Trial Reply Brief. The Plaintiff O'Donnells and Intervenors Reply Brief was filed on November 1, 2019. The court held a Post-Trial Hearing and heard closing arguments on November 13, 2019, and thereafter took the case under advisement. On September 16, 2020, a Motion of Winchester Boat Club, Inc. to Reopen Evidence was filed. The Court issued a Memorandum and Order Denying Motion to Reopen Evidence on October 15, 2020. This Decision follows.





Findings of Fact 





 Based on the view [Note 1], the undisputed facts, the exhibits, the testimony at trial, and my assessment of credibility, I make the following findings of fact: 





 1. The Plaintiff WBC owns real property extending from Cambridge Street (at two separate locations) to Everett Avenue in Winchester, Massachusetts, consisting of two continuous parcels, one of which is called the "Clubhouse Parcel" and the other of which is called the "Open Space Parcel." The Open Space Parcel consists of Lots A and B. Exh. 130 at 18. 





 2. The Board serves as the Town of Winchester's Special Permit Granting Authority pursuant to the Zoning Bylaw of the Town of Winchester (Bylaw), Section 9.4.1. Exh. 143, 9-3. 





 3. Intervenors Kevin Sarney and Stephanie Sarney (the Sarneys) reside at 54 Everett Avenue, Winchester, and are direct abutters to the Open Space Parcel. They purchased their house on February 13, 2015 from Janet Sharp Doyle. Tr. 3-86, 4-8; Exh. 36; View. 





 4. Intervenors Timothy O'Donnell and Kathleen Ho (the Ho-O'Donnells) reside at 48 Everett Avenue, Winchester, and are direct abutters to WBC's Open Space Parcel. They purchased their home on May 30, 2014 from Philip and Nina McIntyre. They have resided at the property since August of 2016. Tr. 4-73, 4-130; Exh. 17; View. 





 5. Intervenor Richard Norsworthy resides at 53 Everett Avenue, Winchester, across the road from the WBC Open Space Parcel. Mr. Norsworthy and his wife Cheryl (not a party to this action) purchased their home on June 22, 2015 from Janice Carrigan. Tr 4-141; Exh. 6, Exh. 29, Exh. 30C; View. 





 6. The Open Space Parcel is in a residential "B" zoning district under the Bylaw, also known as an "RDB" district. Exh. 27 at 3; Exh. 140 at 1; Exh. 144. 





 7. In or around 1990, WBC sought to purchase a portion of the Open Space Parcel (Lot A) from then-owners John and Susan Caruso. Exh. 130 at 18. 





 8. On or about October 19, 1990, WBC filed an application in Case No. 2958 with the Board for a special permit to allow the outdoor recreational use of that portion of WBC property known as Lot A, which is comprised of 15,069 square feet of property that is part of the Open Space Parcel. Exh. 130 at 19. 





 9. In 1991, WBC's application in Case No. 2958 was constructively granted, and such grant was affirmed by the Land Court in 1992 (1991 Special Permit). On June 5, 1992, WBC acquired Lot A by deed from John A. and Susan L. Caruso. Exh. 130 at 19, Exh. 15; Winchester Boat Club, Inc. v. Town of Winchester, Land Ct., Misc. Case No. 159205, slip op. at 1-2, 1992 WL 12151112 (Oct. 8, 1992) (1992 Land Court Decision). 





 10. In or about 1994, WBC applied for a special permit to allow it to use the Lot B portion of the Open Space Parcel for non-residential use. The application specifically focused on Lot B, as the Board described in its decision: "The affected land is comprised of (i) Lot 2 (containing 68,340 +/- SF) excepting that portion of Lot 2 [the Open Space Parcel] shown as Lot A (containing 15,069 +/- SF); and (ii) Lot 4 (containing 1,628 =/- SF)." Exh. 130 at 19. 





 11. After hearings, the Board granted WBC's request for a special permit, with certain conditions surrounding plantings and other items, in Decision No. 3021, issued on September 26, 1994. Decision No. 3021 permits, among other things, outdoor recreational use on the property. Exh. 130 at 19; Exh. 121. 





 12. The Board issued an amended Decision No. 3021 (Am. Decision No. 3021) on April 16, 1997. Among other things, Am. Decision No. 3021 states that "[t]he Petitioner has previously obtained (through a deemed grant) [the 1991] Special Permit to use Lot A for outdoor recreational use." Exh. 130 at 19; Exh. 27 at 3. 





 13. The properties owned by WBC's abutters (the Intervenors) changed hands between 2014 and 2015. In particular, the Ho-O'Donnells, located at 48 Everett Avenue, purchased their home on May 30, 2014; the Sarneys purchased their home on February 13, 2015; and the Norsworthys purchased their home on June 22, 2015. Exh. 130 at 19. 





 14. On or about March 31, 2016, WBC applied, in Application No. 3767 (Pavilion Application), to the Board for a special permit seeking to construct a pavilion as part of the outdoor recreational use of Lot A, pursuant to Section 3.1, Group II, Item 9 of the Bylaw. Exh. 130 at 20. 





 15. In its Pavilion Application, WBC also reserved its right to construct the pavilion without the need for a new or special permit in light of the constructively granted 1991 Special Permit, No. 2958. Exh. 130 at 20. 





 16. The Board held public hearings on May 16, 2016, June 7, 2016, and July 12, 2016 on WBC's Pavilion Application. Exh. 130 at 20. 





 17. On August 24, 2016, the Board determined that WBC was required to obtain a new special permit, or an amendment to the 1991 Special Permit for the construction of the pavilion, and denied without prejudice WBC's application for a new special permit for the pavilion (Decision No. 3767). This decision is the subject of the 17- 366 Complaint. Exh. 130 at 20. 





 18. On November 11, 2016, WBC constructed a fence on its property, which separated the Ho-O'Donnells' property from its own. Three days later, on November 14, 2016, the Ho-O'Donnells commenced a lawsuit against WBC, in related Land Court Case No. 16 MISC 000688. Exh. 130 at 20. 





 19. On November 14, 2016, the same day that the Ho-O'Donnells filed the complaint in 16 MISC 000688, the Ho-O'Donnells also sought an enforcement order from the Town's Building Commissioner, John A. Wile, requesting that the Building Commissioner enforce Decision No. 3021, and require WBC to "cease and desist any further construction activities" and remove the fence within seven days. Exh. 130 at 20. 





 20. By letter dated November 22, 2016, Mr. Wile ordered WBC to remove the fence that had been constructed on Lot B. In so deciding, the Building Commissioner determined that the fence was "subordinate to the Board of Appeal Decision No. 3021." Exh. 130 at 20. 





 21. In addition to building a fence along the Ho-O'Donnells' southern property line along the Open Space Parcel, the WBC sought to plant some deciduous trees. On December 20, 2016, WBC appealed to the Board the Building Commissioner's November 22, 2016, determination regarding the construction of the fence, and also the Building Commissioner's December 6, 2016, determination that "[i]t would be my opinion that SP 3021 would be violated by WBC... if they were to plant said trees" that WBC had purchased. The trees were never planted. Tr. 2-170-172; Exh. 130 at 20-21; Exh. 122; Exh. 76F.





 22. Thereafter, the Board held a public hearing on February 27, 2017 and on March 28, 2017, the Board issued its written decision (Decision No. 3798) upholding the Building Commissioner's decision with respect to the fence. Decision No. 3798 is the subject of the 17-204 Complaint. Exh. 130 at 21. 





 23. The Board held another noticed meeting on April 26, 2017 "to supplement or clarify its deliberations and decision regarding [WBC's] appeal of the Building Commissioner's landscaping determination," and on May 1, 2017, issued Supplemental Decision 3798 (Supp. Decision No. 3798) clarifying that the WBC "is bound to the landscape plan and memorandum by Peter Wild, Certified Arborist, referred to in Decision 3021. It cannot deviate from that plan and memorandum without a modification of Special Permit No. 3021." Supp. Decision No. 3798 is the subject of the 17-272 Complaint. Exh. 144. 





 24. In the Spring of 2018, WBC filed an application with the Board for a special permit to construct a boat shed on the Open Space Parcel (Boat Shed Application), as an alternative to the pavilion, and further reserved its right to construct the boat shed without the need for a special permit. Exh. 130 at 21. 





 25. On September 24, 2018, the Board issued a written decision (Decision No. 3856) denying WBC's application for the issuance of a new special permit to permit its construction of a boat shed on the Open Space Parcel. Decision No. 3856 is the subject of the 18-517 Complaint. Exh. 130 at 21; Exh. 140. 





I-The Boat Shed Appeal 





 26. The non-profit WBC was founded in 1900, and has operated as a swimming, sailing and social club ever since. The clubhouse was constructed in its current location around 1901. WBC's facilities may only be used by members or their guests. While any member of the public may join WBC, it is limited in membership. There are currently approximately 300 families who are members, and there is a waitlist five years long. A prospective new member must be nominated by an existing member, and then receive two letters or references from former or existing members. Tr. 1-52, 1- 117, 1-118, 1-135, 2-158, 2-159. 





 27. WBC offers sailing lessons, staggered throughout the day during the sailing season, ranging from a beginner's class starting at 7:30am to an advanced tactics class. Over 100 students participate in the sailing program every year. Tr. 1-138, 1-140. 





 28. A typical day in the sailing program at WBC begins at 7:30 am, when members in the beginner's class retrieve their equipment from their lockers, and ends when the last class gets off the water around 4:00 pm. There are adult sailing classes that occur during the evening, and other members of WBC can sail until dusk. Tr. 1-138, 2- 35, 2-36. 





 29. In addition to providing access to its members, WBC hosts the Winchester High School sailing team for practice and competitions. The Belmont Hill School also practices at WBC. Tr. 1-52. 





 30. The sailing season for the high school sailing team begins sometime in March. For adult members and their children, sailing begins usually in April or May. The sailing program runs four days a week, beginning "as soon as school ends," and runs "typically through the first week of august," or 7 or 8 weeks. Tr. 1-136, 1-137, 2-34. 





 31. WBC typically hires 50 to 60 "teens" during each summer for its operations. Tr. 1-145, 2-166.





 32. The uses permitted on Lot A, as found by this court in the Denial of Summary Judgment issued December 27, 2017, are "limited to those uses proposed in the brief and found by the court in the 1992 Land Court Decision." Denial of Summary Judgment, Page 15. Such uses are limited to open, passive recreational uses, such as picnics, children's play activities, and sitting and enjoying the lake view. Id. at 14. None of the uses included the construction of a pavilion-like structure. Id. 





A. The Bylaw 





 33. Section 3.1.1 of the Bylaw, under the Use Regulations heading, provides that "[i]n each zoning district, land, buildings and other structures may be used as a principal use or an accessory use as specifically set forth in the Table of Use Regulations... Except as provided by law, all existing and future uses of land, buildings and structures not set forth in the Table...are expressly prohibited." Exh. 143, page 3-1. 





 34. Section 10.0 of the Bylaw defines "structure" as "[a]nything constructed or erected with a fixed location on the ground, or attached to something having a fixed location on the ground. Among other things, structures include buildings, mobile homes, walls, fences, billboards and poster panels." Exh. 143, page 10-15. 





 35. In the RDB district, a "[c]ountry club, sporting grounds, or other predominantly outdoor recreational use, excluding any use conducted as gainful business" is permitted by special permit. Exh. 143, page 3-3. 





 36. Section 10.0 defines "accessory use or structure" as "[a] use or structure on the same lot with, and of a nature customarily incidental and subordinate to, the principal use or structure." Exh. 143, page 10-1.





 37. In the RDB district, a "[n]oncommercial greenhouse, tool shed or other similar accessory structure not in excess of 150 square feet of gross floor area" is permitted as of right, without the need for a special permit. Exh. 143, page 3-7. 





 38. Only accessory uses "in connection with scientific research or scientific development or related production" are allowed by special permit "regardless whether such accessory use is on the same lot as the necessary principal use." Exh. 143, page 3-9. 





 39. The Bylaw, § 9.4.2, provides that "a special permits [sic] may be granted by the [Board] if it finds that the beneficial impacts of the proposed use or structure will outweigh its adverse effects on the town or the neighborhood in view of the particular characteristics of the site and of the proposal in relation to that site." In addition to other factors noted in the bylaw, the Board "shall" consider the following criteria: "1. Community needs which are served by the proposal; 2. Traffic flow and safety, including parking and loading; 3. Adequacy of utilities and other public services; 4. Impacts on neighborhood character, including the extent to which: a) building forms and materials are compatible with the prevailing scale and character of buildings in the neighborhood; b) architectural features add visual character to the neighborhood ...; and c) patterns and proportions of windows are consistent; 5. Adequacy of proposed screening and buffering; 6. Impacts on the natural environment, including but not limited to, changes in topography, installation of retaining walls, or the removal of mature trees; 7. Fiscal impacts, including impact on town services, tax base and employment; and 8. Impacts on Historic Resources, as defined in Section 10 of this Bylaw." Exh. 143, page 9-3 to 9-4.





B. The Board's Decision 





 40. The Board's Decision No. 3856, denying 3-0 WBC's application to construct a boat shed on Lot A, made the following findings in reference to the special permit criteria: "1. Community needs: The proposal would not serve community needs, though it undoubtedly would serve the needs of the Boat Club and its members. 2. Traffic Flow and Safety: The proposal, by shifting activity from the Clubhouse Parcel to the Open Space Parcel, would increase drop-off and pick-up traffic on Everett Avenue... 4. Impacts on neighborhood character: The proposal would adversely affect the neighborhood character in two ways. First, the proposed building would greatly exceed the scale of typical residential sheds and be out of place in this neighborhood. Second, the use on the Open Space Parcel would impair the tranquility of that parcel. 5. Screening: The proposed building would be effectively screened from the nearest abutter, though not from the other abutters. However, the trees that screen it would further block that abutter's view of Mystic Lake, which it currently can see through and over the boat racks. 6. Impacts on the natural environment: The open space on the Open Space Parcel would be reduced. 7. Fiscal Impacts: By impairing the Open Space Parcel and its use as described above, the proposed building would reduce neighboring property values, though no party attempted to quantify any such reduction." Finally, the Board concluded that the beneficial impacts of the proposed building and its intended use would be outweighed by its adverse effects on the neighborhood in view of the characteristics of the site and the proposal described. Exh. 140 at 4. 





 41. The Board also found that the proposed boat shed would not comply with zoning requirements, first because it could not be an "accessory use or structure" because it was not on the same lot as the Clubhouse, which is the primary use or structure under § 10 of the Bylaw. Second, the building would be much larger than the nearest category of accessory use, a "[n]oncommercial greenhouse, tool shed or other similar accessory structure not in excess of 150 square feet." Third, the shed would not be permissible in the RDB District as a principal structure, as "[n]othing in the Table of Uses permits a storage facility like the proposed building in that district." Exh. 140 at 5. 





 42. Finally, the Board in its decision also rejected the proposition that the proposed boat shed, if allowed as a permissible structure, would contain a "predominantly outdoor recreational use," because 1) the use would be entirely indoor, and 2) it would not be recreational, because the proposed use was the "storage and retrieval of sails, life jackets, and other accessories." Exh. 140 at 5. 





C. The Boat Shed Proposal 





 43. The proposed boat shed would be constructed entirely within the boundaries of Lot A, along the western boundary, just north of an existing "small wooden shed," in approximately the same location as an existing set of open-air boat racks, but would protrude about 4 feet further east into Lot A than the existing boat racks. It would be located to the east of a stream that flows along the western border of Lot A, and outside of the 100-year flood plain. Exh. 43 at C0.1, C1.0, C1.1, C1.3, C1.4; Tr. 1-31, 1- 34, 1-46, 3-120, 3-124. 





 44. The proposed boat shed would be approximately 697 square feet in total area, 41 feet long and 17 feet wide. The original proposal was for a slightly larger boat shed, 17 feet tall, and 49 feet long by 17 feet wide, for a total of 833 square feet of area. The existing boat racks that the boat shed would replace measure approximately 10 feet wide by 48.5 feet long and are about 6 feet tall. The proposed shed has three doors: two 3-foot-wide pedestrian doors on the southern end to access the lockers, and an 8-foot wide garage-style door on the northern end to access the 315 square foot storage space. Exh. 43 at C1.1, SK-1 Floor Plan; Exh. 114M; Tr. 1-34, 1-39, 1-40, 1-42, 1-43-44, 3-91, 3-137. 





 45. It is unclear how tall the proposed boat shed would be. Lawrence Beals testified that the proposed height was 12 feet, 4 inches. However, the SK-1 Floor Plan appears to show that the numbers "12" and "4" refer to the pitch of the roof, which was confirmed by expert witness Christopher Mulhern, the architect who designed the boat shed. Mr. Mulhern estimated that the height of the proposed shed was 11 to 12 feet, but no plans in Exh. 43 show the height of the proposed boat shed. It was conceded by Mr. Mulhern that whatever the height, the proposed boat shed would be higher than the existing 6-foot-tall boat racks, as well as the existing small wooden shed. Exh. 43, SK-1 Elevations; Tr. 1-43, 3-88, 3-111, 3-125, 3-137. 





 46. The proposed boat shed is designed to be handicap accessible, with pavers leading up to the doors on the southern side, and featuring 5-foot wide gaps between the rows of lockers on the interior for accessibility. Exh. 43 at C1.1; Tr. 1-31, 1-38. 





 47. The proposed boat shed was designed with windows above the lockers so that during the day there would be sufficient natural light to use the shed without electricity. Tr. 3-92; Exh. 43 at SK-1 Elevations. 





 48. The proposed boat shed would contain 100 lockers for the storage of sailing equipment currently being stored in metal storage containers on the Club House Parcel, as well as a 315 square foot space for storing WBC's racing equipment. The boat shed would not actually be used to store any boats. The shed would be used primarily by the sailing program during the sailing season, and would not be used by the Winchester High School sailing team or the Belmont Hill School. Exh. 43 at C1.1, SK-1 Floor Plan; Tr. 1-36, 1-37, 1-38; View. 





 49. The lockers in the proposed boat shed would be accessed daily during the sailing program season, beginning around 7:30 am, then accessed multiple times throughout the day until at least 4:00 pm but possibly until dusk. Many of the boats used for the beginner's class are also used in the intermediate class, so students arriving later in the day do not necessarily have to use the locker right away. Students "typically" use their lockers twice a day. The lockers would not be used by competitors attending regattas hosted by the WBC. Tr. 1-85-86, 1-138, 1-139, 1-143, 2-35, 2-36, 2-43. 





 50. The boat racks currently located on Lot A are used for storing boats belonging to WBC members, and possibly some WBC-owned kayaks and stand-up paddle boards, during the summer. The WBC policy is to have all personal watercraft in the racks removed from the property during the off-season. Tr. 1-96, 1-124. 





D. Community Needs Served by the Proposal 





 51. According to Lawrence Beals, the proposed boat shed would not result in any increase in the membership of WBC. Rather, the boat shed would provide "a needed storage function" for the existing members. I credit his testimony. Tr. 1-53. 





 52. The lockers that would be in the proposed boat shed would be used for the storage of personal items by boat club members, many in connection with the sailing program. In particular, the lockers are used for storing the equipment and gear that go along with the boats, including sails, mains, jibs, life jackets, sailing gloves, sponges, rudders, and masts. Tr. 1-138, 1-141, 2-42. 





E. Traffic Flow and Safety 





 53. It is common practice for WBC members to park on Everett Avenue, Edgewater Place, or Sheffield West because there is not enough room in the clubhouse parking lot to accommodate all of the WBC members during the sailing season. During peak usage, a queue of cars forms in the parking lot, such that WBC delegates a sailing instructor or manager to stand outside to expedite the unloading process. Tr. 1-115-116; 2-31; 2-209; Exh. 6 at 4; View. 





 54. There is a gate at Everett Avenue that provides pedestrian access to the Open Space Parcel, and thereby to the Clubhouse Parcel by means of a pedestrian bridge. There was evidence presented, and I so find, that the gate is used by WBC members who are dropped off on Everett Avenue or who have parked on the surrounding side streets to access WBC's property. According to Ms. Ho, a direct abutter, members are dropped off on Everett Avenue and enter through the gate, or are picked up and exit through the gate, multiple times a day every day during the summer. Mr. Norsworthy, who lives across Everett Avenue from the gate, has seen WBC members drop their children off on Everett Street dozens of times, and seen WBC members use the gate as a location to retrieve their boats. I credit their testimony. Tr. 3-172, 3-180-181, 4-117-118, 4-152-153; Exh. 43 at C01; Exh. 14D; View. 





 55. WBC has a policy contained in its handbook that instructs members on "drop-off procedures" and traffic flow through the parking lot. The "drop-off policy," which prohibits dropping off children at the gate on Everett Avenue, is emailed to members with some regularity to remind them of the policy. In the years before trial, WBC printed notices and placed them on cars that had parked in the neighborhood warning them against parking too close to driveways, pulling up on curbs, and pulling up on grass. There is no evidence that those fliers contained any notice of the drop-off policy. In spite of WBC's efforts to educate members of their policy, however, I find that members do regularly drop off and pick up children on Everett Avenue. Exh. 43 at C0.1, Tr. 1-129, 2-208, 2-209; Exh. 14D. 





 56. As I saw on the view, the path from the Everett Avenue gate to the proposed location of the boat shed is a direct one, as compared with the more circuitous route from the WBC parking lot. There was no expert testimony at trial about the relative distances between the proposed boat shed and the two access points. However, it was clear that the boat shed would be far more accessible by the Everett Avenue gate for WBC members approaching from the side streets to the east, where they often park, than by the Clubhouse Parcel entrance. View; Exh. 43 at C0.1. 





 57. Ms. Ho was the only witness to testify as to the frequency of the use of the existing boat racks on the Open Space Parcel, and she testified that some people use them once a week. She also estimated that there is room for 27 canoes in the existing racks. I credit her testimony. Tr. 4-93. 





F. Impacts on Neighborhood Character 





 58. The proposed boat shed would be constructed with a clapboard finish with corner boards, a dormer over the western windows, and projecting rafter tails in "traditional New England fashion." Tr. 3-92, 3-93. 





 59. In comparing the proposed shed with other structures in the neighborhood, expert Mr. Mulhern testified that the proposed shed would be "comparable in scale and height" as well as trim to, albeit larger than, a shed owned by the Ho-O'Donnells, but smaller in footprint and height than their garage. In the surrounding neighborhood, Mr. Mulhern testified that the typical secondary structure was a two-car garage, roughly 20 by 20 feet. However, Mr. Mulhern also admitted he did not know the dimensions of the Ho O'Donnell shed, and admitted on cross-examination that the proposed boat shed would be twice as long as the average secondary structure in the neighborhood. I credit his testimony. Tr. 3-95, 3-96-97, 3-103, 3-104. 





 60. To reduce the clanging noise of the lockers, as well as to prevent corrosion with wet equipment, the proposed boat shed is designed with lockers composed of a phenolic compound or plastic resin, which does not corrode and is quieter than a standard metal locker. Tr. 1-37-38. 





G. Adequacy of Proposed Screening and Buffering 





 61. While the proposed boat shed would be screened on the western side by proposed trees and plantings, it will not be screened from Everett Avenue to the north after removal of a mature maple tree, and will it not be screened on the eastern side. Exh. 43 at C1.1, C1.3; Tr. 1-46; View. 





 62. The Sarneys and the Ho-O'Donnells can see the existing boat racks from their properties, and will be able to see the proposed boat shed if constructed. Tr. 1-56, 1- 148, 3-166, 4-134; Exh. 96B; View. 





H. Impacts on Natural Environment





 63. The proposal for the boat shed would leave in place a large oak tree (28 inches in diameter) that would remain between the proposed boat shed and the existing storage shed. However, one Norway maple (22 inches in diameter) would be removed as a part of the proposal. Exh. 43 at C1.1; Tr. 1-32, 1-35. 





 64. WBC's proposal includes a series of plantings of evergreen trees and shrubs that would be planted between the proposed shed and the stream on the western boundary of Lot A in order to "restore the land between the stream and the shed and to provide some wildlife value and some habitat value in that area." Tr. 1-46-47; Exh. 43 at C1.3, C1.4. 





 65. Both Ms. Sarney and Ms. Ho testified that the Open Space Parcel is currently a tranquil space that they enjoy from their yards, which has some wildlife. I credit their testimony. Tr. 3-153, 4-75-76. 





II-The Landscaping Appeal 





 66. Am. Decision No. 3021 describes the scope of the Special Permit issued to WBC to use the Open Space Parcel. In terms of landscaping, the Special Permit required WBC to "install and maintain plantings in accordance with the Landscape Plan... along the properties owned (now or formerly, n/f:) by the Gutheries, McIntyres, Carrolls," as well as to install and maintain evergreens along the parking spaces behind the clubhouse. Exh. 27 at 1. 





 67. The "Landscape Plan" referred to in Am. Decision No. 3021 is made up of "an undated memorandum from Peter Wild, Certified Arborist, describing landscaping work completed and to be completed" and "a set of three plans showing proposed and completed landscaping work also prepared by Mr. Wild." The "set of three plans" has not been located, and was not in evidence at trial. Exh. 27 at 4. 





 68. In Supp. Decision No. 3798 the Board upheld the Building Commissioner's determination that WBC's proposed tree plantings along the Ho O'Donnells' property line would violate Decision No. 3021, finding that the WBC was "bound to the landscape plan and memorandum by Peter Wild, Certified Arborist, referred to in Decision 3021. It cannot deviate from that plan and memorandum without a modification of Special Permit No. 3021." Exh. 144 at 2. 





 69. Peter Wild testified at trial that he had done work for WBC on the Open Space Parcel. When it was being developed, he planted plant material and "amended the soil for turf health." Along the eastern boundary of Lot B, he planted some white pine trees; on the northeast boundary of Lot B to the west of the Ho-O'Donnell property, he planted some arborvitae; and along the Ho-O'Donnells' (then the McIntyre's) southern boundary on the WBC side, he planted a row of yews. The yews were planted in a continuous border, which Mr. Wild intended to create a buffer between the two properties. I credit his testimony. Tr. 3-7, 3-9, 3-17, 3-26. 





 70. Mr. Wild identified Exhibit 151 as a plan prepared by the BSC Group on May 14, 1990, which he signed on March 22, 1993, and used to make plant type recommendations to the Conservation Commission. At the time, he had highlighted the plan, and wrote in planting recommendations at the bottom. Tr. 3-22-23, 3-25; Exh. 151. 





 71. An invoice Mr. Wild gave to the WBC for work done in 1994 lists 12 white pines, 18 arborvitae, ten hemlocks, and 20 yews, which matches in number and kind the plantings listed on a memorandum entitled "Proposed List of Conditions to the Board of Appeals of the Town of Winchester from Winchester Boat Club, Petition No. 3021," describing "landscaping work completed on the new land as of June 15, 1994." ("Undated memorandum.") The next page of that memoranda describes "landscaping work... remaining to be completed," and references ten forsythia, seven shadblow serviceberries, twenty-five Hicks yews, six highbush blueberries, a wildflower patch, and the planting of five additional white pine trees. Other than the white pines and a wildflower patch, Mr. Wild testified that those are all the plant materials along the western border of the Open Space Parcel as shown on Exhibit 151. I credit his testimony. Tr. 3-34, 3-42, 3-43, 3-44, 3-45; Exh. 78, Exh. 151, Exh. 152 at 3. 





 72. The work completed prior to June 15, 1994 as described in the undated memorandum included the planting of white pines "set in" from the eastern property line, twenty 16-20-inch yews along the north property line with McIntyre (now the Ho O'Donnell property line in question), eighteen arborvitae along the east property line with McIntyre, ten Hemlock trees along the western end near the stream, and the open area in the parcel had been planted with fescue grass. Exh. 152. 





 73. The work to be completed as described in the undated memorandum includes the planting of ten forsythia along the western side of the property by the stream, the planting of seven shadblow serviceberry plants along the same side, the planting of twenty-five hicks yews along the west side of the property "opposite of the Beaton property," planting of six highbush blueberries on Lot A, the planting of a wildflower patch adjacent to Mystic Lake, maintenance of a cleared area, and the planting of five additional white pine trees along the east property line with Carroll, three at the lake end, and two at the McIntyre end. Exh. 152. 





 74. I find that Exhibit 152, a set of memoranda entitled "Proposed List of Conditions to the Board of Appeals of the Town of Winchester from Winchester Boat Club, Petition No. 3021," is the "undated memorandum from Peter Wild, Certified Arborist, describing landscaping work completed and to be completed" (hereinafter referred to as the "undated memorandum") that constitutes a part of the "landscape plan" referred to in Decision 3021 (as amended.) Exh. 27 at 4; Exh. 152. 





 75. Mr. Wild confirmed that the landscaping shown on Exhibit 151 shows one existing maple tree on the Ho-O'Donnells' southern border, but that there are no proposed trees shown on that border. There were no trees proposed on that plan along the southern portion of the Ho-O'Donnells' property, nor could Mr. Wild recall any plan he created that proposed trees along that border. Tr. 3-28, 3-29-30; Exh. 151. 





 76. Nowhere in the undated memorandum, or anywhere on Exhibit 151, was there a plan to plant the type of trees the WBC sought to plant in 2016 anywhere on the property, nor was there a plan or an existing row of such trees along the property line between the WBC's Lot B and the McIntyre's (now Ho-O'Donnells') southern property line. Exh. 151; Exh. 152; 76F; Tr. 3-34-35. 





III-Kevin Sarney's Interactions with the Board 





 77. Kevin Sarney, in addition to being a direct abutter to the WBC property, is a member of the Board and has been its chair since sometime in 2018. Tr. 2-85-86. 





 78. Mr. Sarney recused himself from the Board's consideration of WBC's petition to build a pavilion, as well as for the subsequent petitions by the WBC to the Board. However, he continued to represent his interests as an abutter, after receiving advice from the State Ethics Commission that he could do so. Exh. 133 at page 11; Tr. 2- 144, 2-145-146. 





 79. It was no secret that Mr. Sarney opposed the WBC's proposals to construct a pavilion, and then a boat shed. In his private capacity, he sent a letter to the Board and its clerk in July 2016 opposing the pavilion, sent an email to the Building Inspector and Conservation Commission to look into the boat racks in November 2016, and forwarded said email to the Town Manager in December 2016, He wrote a letter with his wife to the Board opposing the Boat Shed Application on May 21, 2018, a letter opposing the boat shed to the Conservation Commission on May 22, 2018, and a letter to the Building Commissioner on June 13, 2018 regarding the existing boat racks. Mr. Sarney gathered signatures for a petition against the pavilion application and signed a petition against the Boat Shed Application as an abutter. Finally, he published a letter to the editor in Winchester Wicked Local in September 2018 which notes that he was a member of the Board, and that he "recused himself from previous Zoning Board discussions 

regarding boat club-related issues." Tr. 1-128, 2-84, 2-85, 2-88, 2-100-101, 2-108, 2-120-121; Exh 6, Exh. 64, Exh. 116, Exh. 146, Exh. 147, Exh. 148, Exh. 150, Exh. 155 at 2. 





 80. The Board members who participated in Decision No. 3856 denying WBC's application to construct a boat shed, were Rakel Meir, Dorothy Simboli, and Mark Regan. There is no evidence before me that Mr. Sarney discussed the decision with any of them or tainted the decision in any way. Mr. Sarney did not attend the Board hearing on the Boat Shed Application on July 30, 2018. Exh. 140 at 1; Tr. 2-134.





 81. Mr. Sarney and Ms. Simboli were seen on July 31, 2018, the day after the Board made its decision on the WBC's boat shed petition, chatting in Mr. Sarney's driveway. According to Ms. Simboli and Mr. Sarney, during their conversation they did not discuss the WBC's application, the Board's decision, any other Board business, or the Winchester Boat Club. Long-time acquaintances, they discussed her jeep and tennis, since both their sons played. I credit their testimony. Tr. 2-6-7, 2-133, 2-135-136, 5-9-10, 5-13, 5-15, 5-16. 





Discussion 





Part I: Legal Standard 





 Appeal pursuant to G.L. c. 40A, § 17, of a denial of a special permit by a local zoning board is reviewed under a two-part framework, involving "a combination of de novo and deferential analyses." Shirley Wayside Ltd. P'ship v. Board of Appeals of Shirley, 461 Mass. 469 , 474 (2012). The first step involves determining "whether the board's decision was based on 'a legally untenable ground' or ... on a standard, criterion or consideration not permitted by the applicable statutes or by-laws." Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 73 (2003), quoting MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635 , 639 (1970). A judge must give the board "substantial deference" to its interpretation of its bylaws, and uphold a reasonable construction of the board, due to its "special knowledge" of the history and purpose of the bylaws. Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374 , 381-382 (2009) (internal citations omitted). 





 If the board has used proper criteria and standards in making its decision, the second step is to determine, "on the basis of the facts it has found for itself," whether the denial of the special permit was unreasonable, whimsical, capricious or arbitrary. Britton, 59 Mass. App. Ct. at 74. This step is highly deferential and the board's decision may only be overturned if "no rational view of the facts the court has found supports the board's conclusion that the applicant failed to meet one or more of the relevant criteria found in the governing statute or by-law." Id. at 75. 





Mr. Sarney's Influence 





 WBC argues that the alleged actions and attempts of intervenor Kevin Sarney, who is also a member of the Board, to unduly influence town officials should cause the court to withdraw its deference to the Board's denial of WBC's Boat Shed Application, and substitute its judgment for that of the Board. Because WBC could not prove any undue influence at trial, nor could they point to caselaw supporting such a drastic remedy under these facts, the Board will be granted deference under the Wendy's Old Fashioned Hamburgers standard. 





 Mr. Sarney acted well within his rights under the law. In the one Massachusetts case cited by WBC that stands for the idea that a board member who abuts an applicant must recuse themself, Windsor v. Planning Bd. of Wayland, 26 Mass. App. Ct. 650 (1988), the court notes that the board member, Windsor, "was a member of the planning board during the entire period, but in this matter he participated only as a private citizen," but says nothing about whether any other actions he took were improper. Id. at 652. Windsor was permitted to write to the planning board "attacking the subdivision plan in detail." Id. Like Mr. Sarney has done here, Windsor also apparently exercised his rights at every stage of the application, including attending a hearing at the board of health. Id. Windsor does not stand for the idea that recusing oneself and zealously advocating for one's interest as an abutter can so taint the decision that the board the abutter sits on must be stripped of deference. 





 Another case cited by the Plaintiffs is also distinguishable from the circumstances surrounding the WBC's applications to the Board. In an unreported case, Indian Hill Assocs., Inc. v. City of Worcester, 2002 WL 31973198 (Mass. Super. 2002), judgment aff'd in part and rev'd in part, 66 Mass. App. Ct. 1108 (2006), the Worcester city manager was accused of violating G.L. c. 268A, § 23, by "participating" in decision-making surrounding the development of a subdivision to which he was a direct abutter. Id. at *24. However, "notwithstanding the apparent failure of the city manager to immediately distance himself from all administrative contact with this subdivision," by ordering a review of the subdivision through his department, the court found no violation of the statute because the plaintiff did not prove the manager "actively 'participated' in any order or decision of the city significant to any aspect" of the case. Nor was any order or decision of the city "done at the direction or encouragement of [the city manager] for the purpose of favoring" him for his advantage. Id. Rather, the actions complained of were the "proximate result" of the actions of the city law department, not the actions of the city manager. Id. at *25. Here, Mr. Sarney did not even attend hearings on the WBC's Boat Shed Application. All the actions he took--signing petitions, writing to the local paper, writing to the Board, writing to the Building Commissioner--were taken as a private citizen, and were not shown to have been the proximate cause of the Board's decision. 





 WBC's citation to a New Jersey decision, Szoke v. Zoning Bd. of Adjustment of the Borough of Monmouth Beach, 616 A.2d 942 (N.J. Super. Ct. App. Div. 1992), is also unavailing. There, the New Jersey Superior Court Appellate Division reversed a zoning board's approval of a variance when a board member who had recused himself from voting nonetheless attended the hearing on the variance application and participated at least three times in support of the variance. Id. at 943-944. The Appellate Division held that the board member's conduct was "totally incompatible" with the spirit of noninvolvement, and "necessarily poisoned the spirit of impartiality with which the Board's quasi-judicial proceedings must be governed." Id. at 944. Here, not only did Mr. Sarney recuse himself from voting on the WBC's applications, but he also refrained from attending the hearings on such applications, choosing instead to petition the board members through typical first amendment activities. Further, unlike the board member in Szoke, Mr. Sarney had good reason to represent his interests--he is a direct abutter to WBC. See id. at 943. 





 Deference is not owed to a board in all circumstances; indeed, "[d]eference is not appropriate when the reasons given by the board lacked 'substantial basis in fact' and were in reality 'mere pretexts for arbitrary action or veils for reasons not related to the purposes of the zoning law.'" Shirley Wayside Ltd. P'ship, 461 Mass. at 475, quoting Vazza Props., Inc. v. City Council of Woburn, 1 Mass. App. Ct. 308 , 312 (1973). As detailed herein, however, the reasons given by the Board do have substantial basis in fact. Id. Given the lack of evidence of improper interference and the ample factual support for the reasons given by the Board in its decisions, I decline to waive the "substantial deference" afforded to the Board under Wendy's Old Fashioned Hamburgers, 454 Mass. at 381-382. 





Part II: The Boat Shed 





The Board's Interpretation 





 The first step is to determine whether the Board's interpretation of the Bylaw is "legally untenable," with regard to the WBC's Boat Shed Application. WBC applied to construct a boat shed on the Open Space Parcel "pursuant to Section 3.1, Group II, Item 9, and Section 9.4" of the Bylaw. 18-517 Complaint; Exh. 140. In this action, WBC challenges the legality of the denial. 





 The claim contained in the 18-517 complaint that the boat shed could be constructed under the existing the constructively granted 1991 Special Permit was not addressed at trial or in the post-trial briefs and is therefore waived. Even if still live, as I found in my Denial of Summary Judgment, none of the uses permitted under 1991 Special Permit included the construction of a structure. Denial of Summary Judgment, page 15. The same arguments that the WBC advanced in support of building the pavilion under the 1991 Special Permit fail when applied to the construction of a boat shed on the same parcel. I find that the Board was reasonable in determining that the WBC needed a new special permit in order to construct a boat shed on the Open Space Parcel. 





 The next question is whether the Bylaw allows construction of a boat shed on the Open Space Parcel. The Bylaw's definition of "accessory use or structure" is "[a] use or structure on the same lot with, and of a nature customarily incidental and subordinate to, the principal use or structure." Exh. 143 at § 10-1 (emphasis added). In its Decision No. 3856 denying the special permit, the Board found that the boat shed constituted an "accessory use or structure" under the Bylaw, because it is the "kind of structure that is customarily incidental and subordinate to the Boat Club's clubhouse." Exh. 140 at 5. This interpretation precludes construction of the boat shed on the Open Space Parcel, since WBC's clubhouse is on a different lot. Additionally, in the RDB district, the only accessory structures that are allowed as of right are a "[n]oncommercial greenhouse, tool shed or other similar accessory structure not in excess of 150 square feet of gross floor area," or accessory uses "in connection with scientific research or scientific development." Exh. 143 at §§ 3-7, 3-9. The proposed boat shed is in excess of 150 square feet, by nearly 550 square feet. Exh. 43 at C1.1. WBC never argued that its proposed use was "in connection with scientific research" or development. Section 3.1.1 only permits structures "as specifically set forth in the Table of Use Regulations," and prohibits any other use. Exh. 143 at § 3-1. I find that the Board's interpretation was not unreasonable. WBC's clubhouse is the primary structure on the Clubhouse Parcel, to which the storage shed would be incidental--the lockers in the shed would be accessed by members in the sailing program to retrieve the accessories to their boats. It was not unreasonable for the Board to interpret this use as an accessory use where the boat shed is to be used for the sole purpose of storing accessories for the sailing program, whose activities occur on the Clubhouse Parcel and the Upper Mystic Lake. 





 WBC nonetheless argues that the boat shed was allowed as of right because the boat shed's use is a principal use rather than an accessory use, which is essential to the parcel's predominantly outdoor recreational use. Responding to WBC's assertion that the boat shed is authorized as a principal use, the Board found that the proposed building "if considered to be a principal structure, is prohibited in the RDB district" because "[n]othing in the Table of Uses permits a storage facility." Exh. 140 at 5. Finally, it rejected the argument that the proposed building would contain a "predominantly outdoor recreational use" because 1) the use--storage-- would be "entirely indoor," and 2) storage is not a recreational use, because it would be storage of sails, life jackets, and other accessories, rather than boats. Id. 





 This construction of the Bylaw is not unreasonable. The Bylaw does not define "outdoor recreational use," but the term "outdoor" can reasonably be construed to exclude any indoor use, such as storage. It was also reasonable to interpret "recreational use" as excluding incidental uses, such as storage, as a primary use, especially where the "outdoor recreational use" permitted by the 1991 Special Permit is not the sailing program, but those uses "proposed in [WBC's brief]" such as "people sitting and enjoying the lake view," "picnics," and "children's play activities" as well as those uses found by the Land Court in the 1992 Land Court Decision." Denial of Summary Judgment, page 14, 15. In other words, it was reasonable for the Board to reject WBC's argument that the shed would be a principal use, seeing as it is in no way essential to the outdoor recreational use permitted on the Open Space Parcel. 





 Finally, in its challenge to the Board's interpretation of the criteria for obtaining a special permit listed in § 9.4.2 of the Bylaw, WBC discusses only the Board's interpretation of "neighborhood character" to include "tranquility." "A local board of appeals brings to the matter an intimate understanding of the immediate circumstances, of local conditions, and of the background and purposes of the entire by-law." Fitzsimonds v. Board of Appeals of Chatham, 21 Mass. App. Ct. 53 , 57 (1985). I heard and credited evidence that the Open Space Parcel currently is a tranquil space that provides some habitat for local wildlife. It was not unreasonable for the Board to determine that the WBC's surrounding neighborhood, bordering on Mystic Lake, is a tranquil one, and that therefore the impact on "neighborhood character" includes the neighborhood's "tranquility." 





 The WBC argues for the first time in its post-trial brief that the boat shed could be constructed by special permit pursuant to Bylaw § 3.5 as a change to a preexisting nonconforming use (that is, the existing boat racks.) This issue has also been waived--the appeal at issue in this case is to the denial of a special permit that the WBC sought under § 3.1, Group II, Item 9 and Section 9.4.2, not § 3.5. Exh. 140. That issue is not before the court. 





 Therefore, affording the Board "substantial deference" to its interpretation of the Bylaw, I find that the Board's interpretation was not "legally untenable." Britton, 59 Mass. App. Ct. at 73. 





Application to Facts 





 Having found that the Board's decision was not based upon a "legally untenable" interpretation of the Bylaw, the next question is, "on the basis of the facts [the court] has found for itself," whether the denial of the special permit was "unreasonable, whimsical, capricious or arbitrary." Britton, 59 Mass. App. Ct. at 74. If "any reason on which the board can fairly be said to have relied has a basis in the trial judge's findings" and could support a rational board's denial of the permit, the Town's decision must be sustained. S. Volpe & Co. v. Board of Appeals of Wareham, 4 Mass. App. Ct. 357 , 360 (1976). This analysis is "highly deferential," such that only in those "rarely encountered points where no rational view of the facts" found by the court could support the denial of the permit should the decision be overturned. Britton, 59 Mass. App. Ct. at 74-75. Even if a board "cites no particularized reasons or any specific evidence" for its decision, its decision will be upheld on appeal under G.L. c. 40A, § 17, "if a rational basis for the denial exists which is supported by the record." Davis v. Zoning Bd. of Chatham, 52 Mass. App. Ct. 349 , 356 (2001). I do not sit as a one-person board of appeals, and it is not for me to substitute my judgment for the Board's regarding adverse effects upon the neighborhood. ACW Realty Mgt. v. Planning Bd. of Westfield, 40 Mass. App. Ct. 242 , 248 (1996). As it is often recited, it is "the board's evaluation of the seriousness of the problem, not the judge's, which is controlling." Wendy's Old Fashioned Hamburgers, 454 Mass. at 382, quoting Subaru of New England, Inc. v. Board of Appeals of Canton, 8 Mass. App. Ct. 483 , 488 (1979) (internal citations omitted). 





 In this instance, the Board may grant a special permit "if it finds that the beneficial impacts of the proposed use or structure will outweigh its adverse effects on the town or the neighborhood in view of the particular characteristics of the site and of the proposal in relation to that site." Exh. 143, § 9.4.2, page 9-3. In reviewing a special permit application, the Board must consider, as relevant here: 1) community needs which are served by the proposal; 2) traffic flow and safety, including parking and loading; 3) impacts on neighborhood character including the extent to which: a) building forms and materials are compatible with the prevailing scale and character of buildings in the neighborhood, b) architectural features add visual character to the 

neighborhood, and c) patterns and proportions of windows are consistent; 4) adequacy of proposed screening and buffering; and 5) impacts on the natural environment, including removal of mature trees. Id. at page 9-3 to 9-4. I will consider the sufficiency of the Board's findings with respect to each criterion in turn. 





 1) Community Needs 





 The Board found in Decision No. 3856 that although the proposal would serve WBC, it would not serve any community needs. Exh. 140 at 4. I find that this determination is rationally supported by the facts. The Bylaw does not define "community," but WBC fails to articulate why the Board's interpretation excluding a private club is unreasonable or unsupported by the facts. It was uncontested that the construction of the boat shed would not result in any increased membership of WBC, but that the boat shed would provide a storage function for existing members. Tr. 1-53. There was no evidence that the boat shed would benefit the Winchester High School sailing team, the Belmont Hill School, or any members of the community that were not already members of the WBC. The WBC is limited in membership, and currently has a 5-year waiting list. Tr. 2-159. A Winchester citizen who wishes to join must first be nominated by an existing WBC member, then get two letters of recommendation from existing or former members. Tr. 1-117. There was no evidence that guests of current members could use the boat shed if constructed. 





 In short, WBC could not show that members of the Winchester community beyond members of WBC itself would benefit from the proposed boat shed. It was not unreasonable for the Board to require such a showing--otherwise, any applicant could satisfy the "community needs" criterion by simply showing that the applicant and its private guests would benefit from a special permit. Without any evidence before me that the boat shed would serve any broader community needs, I find that denial on this basis to be reasonable. 





 2) Traffic Flow and Safety 





 In Decision No. 3856, the Board found that the proposal would increase drop-off and pick-up traffic on Everett Avenue by shifting activity from the Clubhouse Parcel to the Open Space Parcel. Exh. 140 at 4. Here, I also find that this determination is rationally supported by the facts. Despite WBC's efforts to remind its members not to drop off and pick up along Everett Avenue, and not to park in illegal locations in the surrounding neighborhood, I find from the testimony at trial that members do continue to use the Everett Avenue gate for dropping off and picking up children. Tr. 1-129, 2-208, 2-209, 3-180-181, 4-117-118, 4-152-153. Currently, the lockers sit on the Clubhouse Parcel. View. If the lockers are moved to the proposed boat shed on the Open Space Parcel, then the lockers will be more easily accessible by the Everett Avenue gate than by the parking lot on the Clubhouse Parcel. View; Exh. 43 at C0.1; Exh. 4. Seeing as there is already some drop-off and pick-up traffic on Everett Avenue, it is not unreasonable for the Board to predict that that traffic will increase if the special permit is issued. If WBC has trouble enforcing the policy without the boat shed on the Open Space Parcel, there is little to abate the concerns of the Intervenors that such use of the Everett Avenue gate will increase with the addition of the boat shed. 





 It is not for me to substitute my judgment of the adverse effects of this proposal for that of the Board's. ACW Realty Mgt., 40 Mass. App. Ct. at 248. Even long-term members of WBC admitted that the parking problem has likely lasted for as long as the club has existed in its present location. Tr. 2-31. The Board was well within its powers to find that the traffic flow and safety on Everett Avenue would be negatively impacted by the construction of the proposed boat shed. 





 3) Neighborhood Character 





 The Board found in Decision No. 3856 that the boat shed would adversely impact the neighborhood character in two ways, first by exceeding the scale of typical residential sheds, and second by impairing the tranquility of the parcel. Exh. 140 at 4. Bearing in mind that it is "the board's evaluation of the seriousness of the problem," not my own, which is controlling, I find that there is sufficient factual basis for both of these findings. 





 According to WBC's own expert, Mr. Mulhern, the typical secondary structure in the neighborhood is a garage, typically 20 by 20 feet. Tr. 3-96-97. The same expert witness testified that the proposed boat shed, while smaller than the Ho-O'Donnells' garage, would be larger than the Ho-O'Donnells' back yard shed. Tr. 3-95, 3-103. He also admitted that the proposed boat shed, at 17 feet by 41 feet, would be considerably longer than the average 20 by 20 foot secondary structure in the neighborhood. Tr. 1-39-40, 3-104; Exh. 43 at C1.1. This evidence before me is more than sufficient to support the Board's finding that the proposed boat shed would exceed the scale of typical residential sheds--indeed, there is sufficient evidence that the proposed boat shed would exceed the scale of a typical garage in the neighborhood. 





 Next, having found above that "tranquility" is a proper neighborhood characteristic that could be considered by the Board under the special permit criteria, I also find that there was sufficient evidence to support the Board's finding that the tranquility of the Open Space Parcel would be impaired. According to neighbors who testified, the current use of the Open Space Parcel is limited by the special permits held by the WBC, which allow viewing the lake, picnicking, and children's play activities. I have credited the testimony of Ms. Sarney and Ms. Ho that the Open Space Parcel remains a tranquil space which is frequented by some wildlife. Tr. 3-153, 4-75-76. The existing boat racks on the property, used for storing boats belonging to members of WBC and some WBC-owned kayaks, can hold only twenty-seven boats and are accessed by some members once a week. Tr. 1-96, 1-124; 4-9. 





 In contrast, the proposed boat shed would be accessed by more than 100 students in the sailing program every day during the summer, between once and twice a day, starting at 7:30 am. Tr. 1-138, 1-139, 1-140, 1-143. This is not to mention adult members of WBC, who could access the lockers during the summer until dusk. Tr. 2-36. While WBC has designed the proposed boat shed to be less noisy, through the use of plastic resin lockers that make less noise than a typical metal locker, it was still reasonable for the Board to conclude that moving the 100 lockers-- metal or not--from the Clubhouse Parcel to the Open Space Parcel would result in impaired tranquility, and thereby negatively impact the neighborhood character. Tr. 1-37-38, 1-85. It is more than reasonable to conclude that over 100 students using 100 lockers even once a day would disturb the tranquility that currently benefits the area. The Board is more familiar with the character of the neighborhood than I, and I cannot find from the evidence before me that their decision on this point was "unreasonable, whimsical, capricious or arbitrary." Britton, 59 Mass. App. Ct. at 74. 





 4) Screening and Buffering 





 The Board also found in Decision No. 3856 that while the proposed boat shed would be screened from the "nearest abutter," the Sarneys, it would not be effectively screened from other abutters. From the view, I observed that the existing boat racks, which are considerably shorter than the estimated height of the proposed boat shed, were visible from the Ho-O'Donnell and the Sarney properties. Tr. 1-56, 1-148, 3-166, 4-134; Exh. 96B; View. According to the landscape plan in evidence for the proposed boat shed, trees and plantings would be added to the western side of the boat shed to screen the Sarneys, but no screening would be added to the northeast to screen the shed from the Ho-O'Donnells. Exh. 43 at C1.1, C1.3; Tr. 1-46; View. Indeed, the construction of the boat shed would result in the removal of a maple tree that currently screens the boat racks from the Everett Avenue gate. Exh. 43 at C1.1, C1.3; Tr. 1-35; View. Because the Ho-O'Donnells and Sarneys can already see the existing boat racks, and the proposed shed would be taller, it stands to reason that the proposed boat shed would not be screened from their properties under the WBC's proposed plan. Once again, I defer to "the board's evaluation of the seriousness of the problem." Wendy's Old Fashioned Hamburgers, 454 Mass. at 382. 





 5) Impacts on the Natural Environment 





 Finally, the Board found in Decision No. 3856 that the Open Space Parcel's open space would be reduced. The evidence at trial, as I have found, supports this finding. The proposed boat shed would be located in roughly the same location as the existing boat racks, but would be wider by about seven feet, and protrude about four feet further east into the parcel. Exh. 43 at C0.1, C1.0, C1.1, C1.3, C1.4; Tr. 3-120, 3-124. The larger footprint and location of the boat shed would therefore reduce some existing open space. While the loss of four feet of open space may seem minimal, that is not for me to decide. At this "highly deferential" stage of review, even an impact that appears "minimal" can be a sufficient basis for the Board to deny a special permit. See Britton, 59 Mass. App. Ct. at 74-76. Having found that the construction of the boat shed in place of the existing boat racks would reduce the open space on the Open Space Parcel, and would thereby impact the natural environment, I defer to the Board's determination of the seriousness of that impact.





 Even if that finding were arbitrary and capricious, there is another "reason on which the board can fairly be said to have relied": the removal of the mature maple tree in constructing the boat shed. S. Volpe & Co., 4 Mass. App. Ct. at 360. The special permit criteria required the board to consider, inter alia, the "removal of mature trees." Exh. 143 at 9-4. It was admitted at trial that the boat shed's construction would result in the removal of a 22-inch Norway maple tree. Exh. 43 at C1.1; Tr. 1-32, 1-35. While the proposal also includes a series of plantings between the proposed shed and the western boundary of Lot A, it was reasonable for the Board to deny the permit on the basis of the removal of the tree because the Bylaw required them to consider it. Tr. 1-46-47; Exh. 43 at C1.3, C1.4. 





 For the forgoing reasons, I find that there was ample basis for the Board's findings in Decision No. 3856 for its denial of the WBC's Boat Shed Application, and therefore the denial of the special permit was not "unreasonable, whimsical, capricious or arbitrary." 





Part III: The Trees 





 wBC's G.L. c. 40A, § 17, appeal of the Board's Supp. Decision No. 3798 upholding the Building Commissioner's determination that they could not plant certain trees along its boundary with the Ho-O'Donnells turns on whether the decision was based on a legally untenable ground, or was based on an unreasonable, whimsical, capricious or arbitrary exercise of its judgment. Britton, 59 Mass. App. Ct. at 74. In Supp. Decision No. 3798, the Board found that WBC is "bound to the landscape plan and memorandum by Peter Wild, Certified Arborist, referred to in Decision 3021," and therefore could not deviate from that plan and memorandum without a modification of Decision No. 3021. Exh. 144. 





 WBC does not dispute that it is bound by the special permit granted in Decision No. 3021 that allowed outdoor recreational use on the Open Space Parcel. Exh. 27. Once granted, if WBC would like to use the parcel in a manner substantially different from that permitted, it must request a modification of the special permit. See Tenneco Oil Co. v. Springfield, 406 Mass. 658 , 659-660 (1990); Barlow v. Planning Bd. of Wayland, 64 Mass. App. Ct. 314 , 319-320 (2005); Chambers v. Building Inspector of Peabody, 40 Mass. App. Ct. 762 , 767 (1996); E. Mgt. & Dev., LLC v. Padula, 22 LCR 83 , 86 (2014) (11 Misc. Case No. 455042) (Cutler, J.). 





 The question, then, is whether the Landscape Plan referred to in Decision No. 3021 allows for the WBC to plant deciduous trees along the Ho-O'Donnells' southern property line on the Open Space Parcel (which is roughly parallel to Mystic Lake.) If the proposed planting of the trees is within "substantial conformity" with the special permit, then a modification of the special permit will not be required. Chambers, 40 Mass. App. Ct. at 767. 





 Am. Decision No. 3021, describing the special permit granted to WBC for using the Open Space Parcel, required WBC to "install and maintain plantings in accordance with the Landscape Plan" along the boundary with the Ho-O'Donnell property. Exh. 27 at 1. The Landscape Plan is described on page 4 of Am. Decision No. 3021 as "an undated memorandum from Peter Wild," and "a set of three plans." Exh. 27 at 4. WBC argues that the "Landscape Plan" does not exist. As I found, however, Exhibit 152 is the "undated memorandum from Peter Wild." While the set of three plans is not in evidence, the memorandum describes in detail the landscaping that the WBC proposed as part of their application in Petition No. 3021, and the plan marked up by Mr. Wild (Exh. 151) shows the placement of that landscaping. Exh. 152. It is the burden of the WBC, not the Board, to show that their proposed tree plantings are allowed by the special permit. 





 The "undated memorandum from Peter Wild," in describing work completed and work to be completed, lists specific plant types (yews, arborvitae, shadblow serviceberry, highbush blueberries, white pines) and where those plant types were to be located under the then-proposed special permit. Exh. 152. Mr. Wild admitted at trial that the trees that the WBC intended to plant along the border with the Ho-O'Donnells were not of a type included in that memorandum. Tr. 3-35. The only trees that had been planted along the property line in question were "[t]wenty 16- 20 inch yews planted approximately 3 foot on center along the north property line with McIntyre." Exh. 152 at 3. No plan produced by WBC shows that there was any plan to plant another type of tree along that border. It follows, then, that there is no evidence that the trees WBC intended to plant in that location are permitted under the special permit granted to use the Open Space Parcel for outdoor recreation. 





 Due to the detail in the memorandum as to the types and locations of the plant materials allowed, it was reasonable for the Board to find that the planting of the proposed deciduous trees along the Ho-O'Donnells' property would constitute a "substantial change" from the existing special permit. Given the Intervenors' desire to view the lake from their properties, the location and types of landscaping materials on the Open Space Parcel is "of particular and prime importance to neighboring property owners." It was reasonable for the Board to conclude that WBC would need a modification or a new special permit (and the requisite public notice and hearing process involved) in order to plant trees in that location. Chambers, 40 Mass. App. Ct. at 767. As with the Boat Shed Application, I find that there is sufficient evidentiary support for the Board's determinations that the existing permit did not allow for the planting of the trees, and therefore a new special permit would be required. Britton, 59 Mass. App. Ct. at 74. 





Conclusion 





 For the foregoing reasons, I find that the Board's decisions as to the Boat Shed Application and to Petition No. 3798 were reasonable. Judgment shall enter affirming the decisions and dismissing the 17-272, 17-366, and 18-517 Complaints. 





 Judgment Accordingly. 





FOOTNOTES
[Note 1] A view "inevitably has the effect of evidence, and information properly acquired upon a view may properly be treated as evidence in the case." Talmo v. Zoning Bd. of Appeals of Framingham, 93 Mass. App. Ct. 626 , 629 n.5 (2018) (internal citations and quotations omitted); see also Martha's Vineyard Land Bank Comm'n v. Taylor, No. 17-P-1277 (Mass. App. Ct. June 22, 2018) (Rule 1:28 decision). 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.